# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

### PACER Cover Sheet
### for Electronically Filed Documents

Any data shown here are current as of  06/10/06    . Any element of information on this form, except the received date, is subject to change as changes may be made to the Court's official docket.

**Case Title:**    Escala, LLC

**Case Number:**    04-17376

| Document Information |
|---|

**Description:**    Memorandum Opinion on Credit Bid Rights.

Received on:    2005-03-08 15:51:40.000

**Date Filed:**    2005-03-08 00:00:00.000

**Date Entered On Docket:**    2005-03-08 00:00:00.000

| Filer Information |
|---|

**Submitted By:**    James Burke

**If this form is attached to the document identified above, it serves as an endorsed copy of the document as it existed on the above date.  To confirm that nothing has changed since then, review the docket.**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
ESCALA, LLC,
     Debtor.                    No. 7-04-17376 SA

## MEMORANDUM OPINION ON CREDIT BID RIGHTS

### BACKGROUND

On October 8, 2004, one creditor filed an involuntary petition against Escala, LLC ("Escala" or "Debtor") (doc. 1). On November 4, 2004, Escala filed a Motion to Convert Case to Chapter 11, with the approval of the sole petitioning creditor (doc. 18). The Court entered a stipulated order on the same day granting the motion and ordering that it constituted the Order for Relief under chapter 11 of the Bankruptcy Code (doc. 19).

Debtor's assets ("Assets") include a hotel and land in downtown Albuquerque, New Mexico, fixtures and improvements, a liquor license, furniture, equipment, inventory, supplies, trade names and intellectual property, contracts, leases, books and records and other assets. Debtor was operating at a substantial loss. Based on Debtor's business judgment, it began negotiations to sell substantially all of the Assets at an auction to be conducted in February or March, 2005. Debtor filed a motion (doc. 60) on November 23, 2004, seeking approval of the process. After notice and a hearing, the

Court entered an Order approving the motion on December 17, 2004 (doc. 111)(the "Auction Order").

Because various creditors claimed liens on some of the Assets, paragraph 7 of the Auction Order established a procedure for credit bidding at the auction:

> The Court approves the following Credit Bid Rights Procedure:
>
> a. Any party in interest that objects to a creditor holding a claim secured by a lien against any of the Assets (a "Holder") bidding at the Auction and offsetting its secured claim against the purchase price, as specified under Bankruptcy Code §363(k) ("Credit Bid Rights"), shall have until the date that is the later of fifteen (15) days after entry of this Order or January 6, 2005 to object to a Holder exercising Credit Bid Rights at the Auction.
>
> b. A Holder shall have the right to exercise Credit Bid Rights at the Auction if no timely objection is filed pursuant to subsection (a) above.
>
> c. If a timely objection is filed pursuant to subsection (a) above (the "Objection"), unless the Holder disclaims an interest in exercising Credit Bid Rights, the Court will set a preliminary hearing on the Objection to take place within approximately twenty (20) days after entry of this Order, as the Court calendar permits, and will enter appropriate orders to expedite discovery so that a final hearing may be held at least (10) business days before the Auction to hear and determine the Objection.
>
> d. At or following such final hearing, but before the date of the Auction, the Court will estimate the claim to which an Objection was filed for purposes of allowance, pursuant to Bankruptcy Code §502(c), to determine the amount of the allowed claim that may be credit bid. Such claims estimation will include determination of any objection to allowance of a claim to be credit bid (i) that the claim should be equitably subordinated, (ii) that the lien securing the claim should be avoided in whole or in part, (iii) that the debt upon which the claim is based should be recharacterized as equity, or (iv) on any other grounds contesting the extent, amount, validity, priority or avoidability of the claim or any

liens securing the claim.  Such claims estimation shall
be a binding, final determination for all purposes in
this bankruptcy case, including with respect to
distribution of estate assets to the Holder on account of
its secured claims.  Such claims estimation may be
conducted by contested matter under Bankruptcy Rule 9014,
and need not be adjudicated in an adversary proceeding.

## THE MATTER BEFORE THE COURT

This matter is before the Court on the Motion of Dirk
DePree to Determine Allowance and Amount of Claim (doc. 119,
Jan. 3, 2005).  Dirk DePree appears through his attorneys
Lewis and Roca, LLP (Robert H. McKirgan) and Lewis and Roca,
Jontz, Dawe, LLP (R. Thomas Dawe).  Briefly, Dirk DePree seeks
a determination that he has Credit Bid Rights pursuant to his
proof of claim in the amount of $1,001,749.00 for his secured
claim on Escala's Assets.  As discussed in detail below, his
secured claim resulted from his personal guarantee of Escala's
debt to Bank 1st, which holds a first mortgage lien on the
Assets; Bank 1st collected on the guarantee.

Also before the Court is the Unsecured Creditors
Committee's ("UCC") Objection to Holders Exercising Credit Bid
Rights (doc. 127, Jan. 6, 2005). The UCC appears through its
attorney The Law Office of George "Dave" Giddens, P.C. (George
Dave Giddens).  The UCC objects to the holders of second and
third mortgages exercising Credit Bid Rights for two reasons:
1) the second and third mortgages should be recharacterized as

Page -3-

equity interests, resulting in a loss of purported secured creditor status, and, alternatively 2) the second and third mortgages should be equitably subordinated to the claims of the unsecured creditors.  The Holders of the third mortgage disclaimed their Credit Bid Rights.  Ex. 64.

UCC filed a Response in Opposition to DePree's motion to determine allowance and amount of claim (doc. 156, Jan. 21, 2005).  Dirk DePree filed a Response to UCC's Objection to holders exercising credit bid rights (doc. 164, Feb. 2, 2005). Dirk DePree filed a pretrial legal memorandum (doc. 178, Feb. 15, 2005) and the UCC filed a post-trial legal memorandum (doc. 184, Feb. 23, 2005).

The Court conducted trial of these matters on an expedited basis on February 16, 17, 18 and 22, 2005[1].  Having considered the evidence, the pleadings, the arguments of the parties, and being sufficiently advised in the premises, the Court issues this Memorandum Opinion on Credit Bid Rights. The Court has jurisdiction of the subject matter and of the persons who are parties pursuant to 28 U.S.C. §§ 1334 and 157.

---

[1]At the close of the UCC's case, Dirk DePree orally moved to dismiss.  The Court took this motion under advisement and completed the trial.  Based on the Court's disposition in this Memorandum Opinion, the Court will not address the oral motion.

This is a core proceeding.  28 U.S.C. § 157(b)(2)(A), (B), (K), (N) and (O).

**FINDINGS OF FACT**

**GENERAL FACTS**

1.  Escala, LLC, a New Mexico limited liability company ("Escala") is the Debtor in this Chapter 11 case.  Escala does business as La Posada de Albuquerque Hotel ("Hotel", not be confused with the proposed Prado Hotel) in downtown Albuquerque, New Mexico.

2.  Renaissance Holdings, LLC ("Renaissance") is a New Mexico limited liability company that currently owns all of Escala.

3.  Bank 1st ("Bank") holds a first mortgage on the Hotel.  Ex. 7.  Bank had a participant in this loan, Matrix Capital Bank; references to Bank include, as appropriate, references to the participant.

4.  Dirk DePree holds a second mortgage on the Hotel.  Ex. 40.

5.  Mark DePree, Dirk DePree, the DePree Family Limited Partnership, a Michigan limited partnership ("DFLP") and Bradbury Stamm Construction, Inc. ("BSCI"), a New Mexico corporation hold a third mortgage on the hotel.  Ex. 50.

The holders of the third mortgage have disclaimed their right to credit bid at any auction of the hotel.  Ex. 64.

6.   Mark DePree and Dirk DePree are brothers and also general partners in the DFLP with their brother Paul DePree (and perhaps others).

7.   In this opinion, the "DePree Group" refers to Mark DePree, Dirk DePree, DFLP, Paul DePree, the trusts established for Mark DePree's children, and an unidentified group of investors that Mark DePree and/or Dirk DePree brought to Renaissance who allegedly voted in alignment with the DePree Group.

8.   Prinova Capital Group, Inc. ("PCGI") has 15 to 20 shareholders, including Vincent Garcia.  PCGI owns all of Prinova Investments, Ltd., a New Mexico corporation ("PI").

9.   Dirk DePree never was an owner, officer or member of PI.

10.  Mark DePree and, by virtue of the community property law of the state of New Mexico, his spouse Julie DePree may have at one time owned 25% of the shares of PI but neither was ever an officer, director or manager of PI. Neither currently is a member of PI.  Compare T-MD 2/16

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 7 of 114

11:30[2] and 2/22 1:54 (the PI transaction was never consummated and Mark DePree never received a K-1) <u>to</u> T-VG 2/16 3:30 (Mark DePree owned 25% of PI but was never an officer or director) <u>and</u> Ex. 70 (application for liquor license showing Mark DePree's 25% ownership interest). The Court finds it more likely than not that this transaction, while contemplated by the parties, was never consumated.

11. Tilden Drinkard is the sole owner of Layne Hotel Management Corporation (Layne). Tilden Drinkard is a member in Renaissance.

12. Profcor, Inc. ("Profcor") is a company owned by Vincent Garcia and his wife.

13. Factors Plus is a company owned by Vincent Garcia. The Bank cross-collateralized its line of credit to Factors Plus with Escala's loan and mortgage on the Hotel, such that a default on one would be a default on the other.

14. Renaissance was formed effective May 12, 1999 with PI as its manager. Ex. 2, page 26.

---

[2]The Court uses a digital audio recording system to make the record at hearings. References to testimony will be indicated as T-(initials of witness) and date and approximate time. Witnesses were: Mark DePree ("MD"), Vincent Garcia ("VG"), Steven Garrett ("SG"), Tilden Drinkard ("TG"), Roger Nagel ("RN") and Dirk DePree ("DD").

15. Escala was formed effective June 12, 2000 with PI as its sole member and manager. Ex. 4, pages 25 and 26.

16. During the period under discussion, Renaissance had various subsidiary LLC's and businesses including Prado Hotel, LLC, Parking Company of Albuquerque, LLC, and Acropolis Development LLC. Escala subsequently also became a subsidiary of Renaissance. These four entities, collectively, are the "Related Development Entities." See Ex. 19, Loan Agreement at page 18.

17. Neither Mark DePree or Dirk DePree were ever paid a salary by Renaissance or Escala. T-MD 2/22 1:45; T-DD 2/22 2:34.

18. Dirk DePree, all told, loaned, contributed to the capital of Renaissance, and had assets (that he pledged to secure Escala's debts) seized, in the amount of approximately $1.6 million. Over the years, he received one payment of $1,400 on a note. He has never received any profits, dividends, or any property in return. T-DD 2/22 2:35.

**FACTS IN CHRONOLOGICAL ORDER**

19. The setting for this dispute centers on Block 9 of the New Mexico Town Company plat (filed in 1882), bounded by what are now Central and Copper Avenues and by Second and Third Streets. The dispute arises out an expanding

Page -8-

vision by Messrs Garcia, Drinkard and Mark DePree to redevelop and improve an entire historic block of downtown Albuquerque. The project included, at Second and Copper, the La Posada de Albuquerque hotel (which started out in 1939 as the first hotel built by Conrad Hilton), the old First National Bank building at Third and Central to be called the Prado Hotel, and a parking structure (the Acropolis projects) to be constructed at Third and Copper to service both hotels and to include offices, retail space and live/work condominiums. The project was to be implemented and managed through the aptly named Renaissance Holdings, LLC.

20. On July 4, 1998, the "Founders", consisting of Vincent Garcia, Mark DePree and Tilden Drinkard entered into an agreement ("Founders' Agreement") with Profcor, which held a purchase agreement to acquire the old bank building. Ex. 1. The Founders' Agreement contemplated a sale of the bank building to the Founders, set out the responsibilities and duties of the Founders, and provided that Vincent Garcia would own 51%, Mark DePree would own 44% and Tilden Drinkard would own 5%. The Founders' Agreement also placed a value on the services that were to be provided: Vincent Garcia, $12,750; Mark DePree,

Case 04-17376-s11    Doc 194    Filed 03/08/05    Entered 03/08/05 16:11:00 Page 10 of 114

$11,000; Tilden Drinkard, $1250. The Founders' Agreement does not refer to any other entities in existence or to be formed in the future. At the time of the Founders' Agreement, the Founders did not discuss acquisition of any other properties or the formation of any entities. T-MD 2/16 1:55.

21. On or about May 12, 1999 Renaissance was formed and its operating agreement became effective. Ex. 2. The manager was PI or its successor. ¶2(o). Renaissance was formed to own and operate a hotel in Albuquerque. ¶3.01. Article 4 lists the members which include Vincent Garcia, PI, Mark DePree, trusts for Mark DePree's children, Tilden Drinkard, BSCI, DFLP and others. Dirk DePree was not a member of Renaissance or involved with Renaissance, except that he signed the agreement for DFLP as a general partner. See page 26. See also T-VG 2/16 3:30. Mark DePree was an active member and director. Id.

22. Article 5 contains a provision to indemnify managers, employees and agents to the fullest extent permitted by law except for any claims of fraud, deceit, gross negligence, willful misconduct or illegal acts. Ex. 2, ¶ 5.07.

23. Vincent Garcia testified that although the Renaissance operating agreement listed PI as manager, PI always acted at the direction of and for the benefit of Renaissance. _See_ ex. 6 and ex. 12, page 1 (PI acting on behalf of Renaissance.) So, although PI was the manager on paper, it never took any independent actions without instruction from the de facto management group for Renaissance. T-VG 2/16 3:30-3:40. Renaissance's management was always performed by a "board of managing directors" ("Board"), Ex. 11, page 3, which, in May 1999, consisted of the Founders. The Board had expanded to include Dirk DePree by no later than September 2000. _Id._ _See also infra_ note 3.

24. In May, 1999 Renaissance acquired the bank building. T-VG 2/16 3:30. The plan was to convert the bank building into an upscale "boutique" hotel to be called the Prado.

25. During the spring of 2000, Mark DePree first became involved with the Hotel. T-MD 2/16 2:05. It was public knowledge that the Hotel was in a chapter 11 and for sale. The Founders believed it would be beneficial to have two hotels on the same block for economies of scale. _Id._ _See also_ T-VG 2/16 3:50. The idea was to buy the Hotel at a good price with good financing. _Id._ The

Founders made an offer to the bankruptcy court to acquire the hotel by satisfying all creditor claims (thought to be approximately $6.0 million), provided they could settle each claim individually. Id. The bankruptcy court approved the offer, and the project moved forward.

26. Tilden Drinkard previously operated the Hotel for previous owners under the name "La Posada" from 1991 to 1995. He still had the historical operating records. He also obtained newer information from the then owners, the Chapter 11 Debtors. He prepared pro-formas. He testified that, eventually, the Hotel would have adequate net operating income (i.e., after all operating expenses) to pay the debt service anticipated. T-TD 2/17 4:50.

27. Vincent Garcia was the "point person" in charge of the Hotel acquisition, and in charge of putting together the capital structure. Mark DePree assisted in organizing the capital structure. Dirk DePree was not involved in organizing the capital structure. T-TD 2/18 11:10; T-MD 2/22 1:10. Dirk DePree had no involvement in forming Escala. T-MD 2/22 1:10; T-DD 2/22 2:03.

28. Based on all of the evidence presented in the four-day trial of this matter, the Court finds that none of the individuals in these proceedings intended to, or

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 13 of 114

recklessly caused, any harm to creditors. The Court arrives at this finding after reviewing all the witnesses' testimony, their demeanor, and the documents introduced into evidence. In retrospect, the venture about to be described was perhaps aggressive, but all individuals' actions appeared to be based on reasonable business judgment in light of the facts existing or known at the time, particularly in the halcyon days of the summer of 2000.

29. On May 22, 2000, Bank issued a loan commitment for the purchase of the Hotel by a LLC to be formed. The loan would be for the lesser of $3.5 million or 78% of lender approved appraised value, for a term of 30 months, at Wall Street Journal prime plus 1.25% with a minimum rate of 9.75%. Payments were based on a twenty-year amortization. Repayment of the Bank debt would be secured by a first mortgage on the Hotel and a lien on most, if not all, of the Hotel's personal property and intangibles. The commitment required personal guarantees of the entire $3.5 million loan by Vincent Garcia and Mark DePree (and their spouses) and a $1 million personal guarantee from Dirk DePree to be secured by a pledge of $1.2 million of marketable securities he owned. (The

"extra" $200,000 was designed to take into account
fluctuations in the market value of the securities.  T-VG
2/16 4:28.)  The commitment also provided that the
balance of the subordinated debt owed to the seller of
the Hotel could not exceed $300,000 at closing.  Ex. 3.
Dirk DePree was not involved with Bank in the
negotiations for this commitment.  T-VG 2/16 4:00.  At
this time, Vincent Garcia had a connection to Dirk DePree
only through his brother Mark DePree.  Vincent Garcia
approached Dirk DePree in April, 2000 to discuss the
Hotel and a possible pledge of securities to secure the
acquisition; Dirk DePree agreed to pledge his stock.  T-
VG 2/16 4:15.  As the UCC's expert witness Roger Nagel
pointed out, the Bank at this time was breaking into the
commercial lending market in Albuquerque and so was
willing to finance transactions that were somewhat
riskier than the other more esconced banks were willing
to finance.  T-RN 2/18 2:35.  (At the same time,) the
Bank sought to insure that its loan was and would
continue to be amply collateralized.  The Court finds
that without Dirk DePree's guaranty and the pledge of
stock to back up that guarantee, there would have been no
loan from the Bank.

30. On or about June 12, 2000 Escala was organized and the operating agreement became effective. Ex. 4. The manager was PI or its successor. ¶2(o). Escala was formed to own and operate a hotel in Albuquerque. ¶3.01. The sole member of Escala was PI. ¶4.01. Article 5 contains a provision to indemnify managers, employees and agents to the fullest extent permitted by law except for any claims of fraud, deceit, gross negligence, willful misconduct or illegal acts. ¶ 5.07.

31. On June 14, 2000 (as modified on June 21, 2000), Vincent Garcia and Dirk DePree reduced their guarantee agreement to writing. Ex. 5.; Ex. 109 contains Dirk DePree's signature. Dirk DePree was to pledge $1.2 million of marketable securities securing a $1 million guarantee in accordance with Bank's commitment letter. The parties would execute documentation as required by the Bank and any participating banks. Certain contingencies are listed, including "4) [Dirk] DePree agrees to provide advice and consultation to Renaissance from the effective date forward at no cost to the Company, and to serve on

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 16 of 114

the Company's advisory board if such a board is
assembled."[3]

32. The agreement provided for an initial nonrefundable
"commitment fee" of $9,000. As a "Fee" Dirk DePree would
receive 15% ownership[4] in the "consolidated" Renaissance
development[5], which would include: 1) the bank building,
if and when developed or used, 2) the Acropolis parking

---

[3] Dirk DePree testified that at the time of the pledge he
only wanted to be kept informed on Escala's business.
Thereafter, Dirk DePree started visiting the properties, he
got more involved in the businesses, and by 2001 he was an
active manager. T-DD 2/22 2:21. He was never directly
involved in the management of Escala as a hotel, and his only
function was that as oversight of Escala as a member of the
Board of Renaissance. Id. Dirk DePree's testimony about his
role is somewhat belied by the February 2, 2001 minutes of the
Renaissance board, which recite that Dirk DePree lead a
discussion that recited that Renaissance had been led by a
"board of managing directors" comprised of Mark DePree,
Vincent Garcia, Tilden Drinkard and Dirk DePree since
September 2000. And the written agreement between Vincent
Garcia and Dirk DePree for the guarantee and pledge, exs. 5
and 109 ("Contingency 4"), contemplates a role for Dirk DePree
beginning in June 2000.

[4] Dirk DePree testified that he absolutely would not have
paid $1 million cash for 15% of this business. He had never
even been presented a valuation of it. T-DD 2/22 2:05. This
is consistent with the parties' anticipation that the
guarantee would never be drawn on and with Dirk DePree's
consistently husbanding and protecting his financial resources
in this project.

[5] Vincent Garcia testified that at this time, however,
Renaissance did not actually own anything. PI owned the
hotel, although from the outset the parties planned to
transfer the Hotel and other assets into Renaissance. T-VG
2/17 1:50.

Page -16-

structure lease and purchase agreement with the City of Albuquerque, 3) the Acropolis retail and office development, 4) the Hotel, and 5) any other developments of Renaissance located on the square block of the Hotel. In essence, the agreement reached between Vincent Garcia and Dirk DePree, which bore some resemblance to the Silicon Valley deals that Dirk had previously been involved in, was that Escala would pay Dirk DePree $9,000 for the possibility or option of using his guarantee and pledge to induce the Bank to make the loan.[6]  If Escala actually used the guarantee and pledge (merely) to obtain the loan, Dirk was to receive the 15% interest in Renaissance.  Given what some might describe as the

---

[6] That the $9,000 was merely a "signing fee", so to speak, is illustrated by the final language of "Contingency 5" on page 3 of the agreement for the guaranty and pledge (Exs. 5 and 109):

> "5) Subject to the right of [Renaissance] to secure, and Bank 1st's willingness to accept a replacement guarantor or replacement collateral prior to closing, in which case Dirk DePree shall be paid the $9,000 earned commitment fee for having committed to provide the guarantee and collateral pursuant to this agreement and term sheet and in accordance with the terms of guarantee and additional collateral required in the commitment of Bank 1st to provide financing for the acquisition of La Posada de Albuquerque, and in such event that DePree does not act as guarantor, due to said replacement, DePree shall have no ownership interest pursuant to this agreement."

Page -17-

"vulture capital" aspect of the agreement with Dirk
DePree, it is not surprising, as the parties recited at
trial, Vincent Garcia balked at the 15% requested by Dirk
DePree and intended to shop around for a better deal.

33. As explained in more detail below, the agreement did not
address what might happen if the Bank ever executed on
Dirk DePree's securities, because it appears that the
parties assumed that would never happen.  The Bank loan
was to be for a term of 30 months.  The Court finds that
the parties all intended the Bank financing to be
essentially a "bridge loan" to enable the acquisition,
with the intent to pursue permanent financing elsewhere.
See T-DD 2/22 2:00 (Vincent Garcia represented to Dirk
DePree that he would be guaranteeing an "interim loan.");
see also id. 2:08 (It was to be a short term loan, and
Vincent Garcia's intent was to refinance in 12 months and
get the guarantee released.)

34. Vincent Garcia testified that the understanding with Dirk
DePree was that Dirk would set aside securities of $1.2
million to secure the $1 million guarantee, and in
exchange for the risk he was to receive 15% of
Renaissance, with the understanding that there would be a
refinance and release of collateral.  T-VG 2/16 4:30.

Vincent Garcia said that his understanding of the loan documents was, that because subordinated debt was limited to $300,000, any debt to Dirk DePree would have to be equity. He admitted, however, that the documents do not say this.

35. The loan commitment, Ex. 3, paragraph 9, and the Loan Agreement, Ex. 7, anticipate a $300,000 loan from or continuing obligation to the seller (debtor-in-possession La Posada Investors), secured if necessary by a second real estate mortgage junior to the Bank's mortgage. At closing Escala's debt was not supposed to exceed the $3.5 million to the Bank and the $300,000 to La Posada Investors. Id.

36. Dirk DePree's undisputed testimony was that there was no discussion with anyone at this time that this transaction was to be considered a contribution to equity, even if the Bank took the guarantee and pledge as further security for the loan. T-MD 2/22 2:10.

37. The testimony is conflicting whether Vincent Garcia and Dirk DePree discussed what would happen in the event the Bank realized on the securities. Dirk DePree unequivocally testified that this was never discussed. T-MD 2/22 2:03. During trial, Vincent Garcia was asked

Q: "You never discussed with Dirk DePree what would happen if the Bank took the stock?" A: "Not true. He understood the risks." However, Vincent Garcia executed an affidavit on January 17, 2005 in connection with this case. Ex. 62, endnote D, Paragraph 8 of which states:

> 8. During the course of the negotiations for the collateral pledge, it was never <u>discussed, considered</u> or agreed that any portion of the collateral would be treated as a loan from Dirk DePree to Renaissance, Escala or any of the subsidiary companies or that Dirk DePree would be entitled to be repaid any portion of the collateral or would receive any further consideration or compensation in the event the bank seized all or any of the collateral.

(Emphasis added.) The Court finds it more likely than not that Vincent Garcia and Dirk DePree never discussed what would happen in the event the Bank took the collateral.

38. The Bank obtained an appraisal on June 20, 2000 for the Hotel that showed a value of $5.4 million "as is" and $5.8 million "as renovated." Ex. 115. This appraisal was not introduced for the truth of the value of the Hotel; rather, it was to establish that the Bank had obtained an appraisal and later made decisions based on it. In fact, the Bank used this appraisal as a basis for the mortgage loan. T-SG 2/17 9:15.

39. On August 1, 2000, Escala closed on the Hotel for $4,182,000. T-VG 2/17 3:55. The loan documents appear at Exhibit 7. The Business Loan Agreement provides for a $3.5 million loan to Escala, calls for assignments of life insurance policies[7] from Vincent Garcia, Mark DePree and Tilden Drinkard, and calls for guarantees from Vincent Garcia, Mark DePree, and PI each in the amount of $3.5 million and a guarantee from Dirk DePree for $1 million. The rest of exhibit 7 contains the note, a copy of the recorded mortgage, an assignment of rents, security agreements, and other documents executed after the closing.

40. Exhibit 8 is Dirk DePree's Guarantee and pledge dated August 1, 2000. It provides that *if* Escala should become insolvent *and* Bank's debt is not fully secured, *then* Dirk DePree would waive any claim he had against Escala for subrogation, so that he would not be considered a creditor within the meaning of 11 U.S.C. § 547(b).[8] The

_____

[7] Mark DePree testified that Escala obtained the life insurance policies for these parties and paid the premiums. T-MD 2/22 1:50.

[8] This common provision in guarantee documents is a result of Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Construction Co.), 874 F.2d 1186, 1200-01 (7th Cir. 1989)(holding that preference recovery period for outside
(continued...)

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 22 of 114

evidence at trial was uncontradicted[9] that Bank was never undersecured. T-SG 2/17 9:10, 9:20. And ultimately, when the Bank executed on Dirk DePree's securities in February, 2004, the Bank consented to Dirk DePree's second mortgage. Ex. 41.

41. On or about August 1 or August 6, 2000, Layne took over management of the Hotel. Tilden Drinkard testified that the Hotel was financially strapped from the beginning. The Hotel needed repairs and maintenance. The Hotel needed new beds, laundry facilities, televisions, etc.

---

[8](...continued)
creditors is one year when the payment confers a benefit on an inside creditor, including a guarantor). However, section 547(b)(4)(B) was amended by § 283(m) of the Bankruptcy Act of 1986. That section now states that the creditor paid must be the insider. See Pereira v. Lehigh Savings Bank, SLA (In re Artha Mgt. Inc.), 174 B.R. 671, 674 (Bankr. S.D. N.Y. 1994)("[T]he Deprizio Doctrine has recently been precluded by legislative enactment.") The Court finds that inclusion of this Deprizio doctrine clause in the guarantee was inserted only for Bank's benefit and does not represent an intentional waiver by Dirk DePree of his common law or state law rights of subrogation.

[9] As will be shown below, in fact Bank later seized the pledged securities. On cross examination, the Bank officer was asked why Bank seized Dirk DePree's securities if it were not undersecured. He testified that at the time of the seizure the note was past due and not being performed, that the Bank had the right to seize, and it exercised that right. T-SG 2/17 9:45. He also testified that it was easier to seize the collateral than to foreclose on the Hotel. Id. 9:49. The Court finds this explanation entirely credible, and finds that the seizure is not evidence of an undersecured status.

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 23 of 114

There were insufficient funds to make these repairs and improvements. Tilden Drinkard found a lease program to obtain the assets, at financing rates ranging from 18 to 21% annual interest. All leases were approved by the Managers. T-TD 2/18 8:20-8:35.

42. Exhibit 10 is Escala's 12/31/2000 balance sheet prepared by Tilden Drinkard. It shows a net worth of $163,000. It also shows a loss for the period 8/1/2000 to 12/31/2000 of $376,000. T-TD 2/18 8:45.

43. On January 24, 2001 Escala gave Dirk DePree a promissory note in the amount of $100,000, dated 12/11/2000 and bearing interest from that date. Ex. 9. Vincent Garcia testified that at the end of 2000 Escala needed cash and Dirk DePree offered to lend it. T-VG 2/17 9:55.

44. On March 6, 2001 Susie Fenstermacher, Vice President of PI (see Ex. 2 page 26), as agent of Renaissance faxed the 12/31/2000 Renaissance balance sheet and profit and loss statement to Dirk DePree and Mark DePree. Ex. 111. The balance sheet showed net equity of $1.3 million on that date. Dirk DePree is not listed as a member.

45. On March 13, 2001, Renaissance, Escala, Prado Hotel, Parking Co. and PI entered an agreement that approved and agreed to the transactions set out in the "Proposed

Case 04-17376-s11    Doc 194    Filed 03/08/05    Entered 03/08/05 16:11:00 Page 24 of 114

Restructuring of Renaissance" approved by the members of

Renaissance on March 13, 2001.  Ex. 14.  PI by Vincent

Garcia signed the agreement on behalf of Escala.  The

Proposed Restructuring Agreement appears at Exhibit 12.

The effect of the Restructuring was for Renaissance to

obtain ownership of the bank building, the Hotel, and a

parking structure, and all investors in all these

properties would be confirmed as being members of

Renaissance.  Ex 12, page 2.  Paragraph III(B) states:

> Assuming the approval of the Restructuring by
> the Renaissance membership, it is anticipated
> that all guarantors and secondary obligors of
> obligations of Renaissance and the Subsidiaries
> (e.g., Prinova, the Garcias, the DePrees and
> Dirk DePree)(collectively, the "Guarantors", as
> shown on Exhibit B) will seek to have such
> guarantees and other obligations released.
> Renaissance will use reasonable efforts to
> assist in such efforts, including, where
> permitted by creditors, having the respective
> Subsidiaries assume the guarantee obligations.
> In addition, Renaissance will agree to indemnify
> the Guarantors against all liability and expense
> arising from the failure of the primary obligors
> to pay the obligations.  The Restructuring will
> not, however, be contingent in any respect on
> the Guarantors' success or lack thereof in
> obtaining releases.
> Renaissance shall also indemnify
> Prinova against any expense to Prinova
> arising out of a failure by Renaissance or
> any Subsidiary to pay an obligation
> incurred by Prinova for the benefit of
> Renaissance or the Subsidiary and assigned
> to Renaissance or the Subsidiary as part of
> the Restructuring.

Exhibit A lists Dirk DePree as a Consolidated Renaissance member with a 12.14% interest. Exhibit B lists Dirk DePree as a "Gurarantor" [sic] on the Hotel for $1 million.[10] Exhibit C contains a balance sheet for Escala as of 12/31/2000 that shows net equity of $138,000.

46. On direct examination, Vincent Garcia stated that the deal he entered with Dirk DePree regarding the pledge was that any amount seized by Bank would be treated as a capital contribution to Renaissance. On cross examination he was asked, if the deal was to capitalize any amount taken, why would Dirk DePree be listed as a guarantor with indemnity rights. Vincent Garcia admitted that, if the deal had been for an equity contribution, Dirk DePree would not be listed as a guarantor with indemnity rights. T-VG 2/17 2:26.

47. After March 13, 2001, the Board commenced a series of transactions to execute documents and transfers, on a schedule. T-VG 2/17 10:00.

48. By May, 2001, the DePree Group controlled over 50% of the votes of Renaissance. T-VG 2/17 3:00. The Group could

---

[10] Mark DePree testified that the four Board members discussed the contents of Exhibit B, and Vincent Garcia did not suggest that Dirk DePree's guarantee should be excluded. T-MD 2/22 1:15. All four Board members voted for this provision. Id.

Page -25-

have made Mark DePree sole manager at that time or any time thereafter.  <u>Id.</u>

49. The First Amended and Restated Operating Agreement of Renaissance became effective on May 31, 2001.  Ex. 15. Section 13.04 provided that the operating agreement could only be amended by a 2/3rds vote of the member interests. The amended agreement also officially placed management in a Board of Directors that consisted of Dirk DePree, Mark DePree, Vincent Garcia and Tilden Drinkard.  Vincent Garcia testified that the changes reflected regarding management were made to have the documents conform to how the business had been actually operated virtually from the closing date of the Hotel.  T-VG 2/17 10:10.

50. On or about August 1, 2001, the first anniversary of the Bank loan, Dirk DePree started to become concerned that the loan had not been refinanced.  T-DD 2/22 2:13.

51. The events of September 11, 2001 had a devastating impact on Escala's business,  T-MD 2/16 3:15, T-VG 2/17 10:15, 10:25, amplifying its already woeful undercapitalization.

52. Around Christmas, 2001, Escala was having significant problems and needed cash.  T-MD 2/16 2:15; T-VG 2/17 10:25.

53. Escala's 12/31/2001 balance sheet appears at Exhibit 16. It shows negative capital of $304,000. It also shows a negative account receivable from Renaissance (i.e., a liability from Escala to Renaissance) of $387,000. T-TD 2/18 9:03. If this amount payable to Renaissance were considered capital invested by Renaissance, as urged by Dirk DePree[11], there would have been a small positive capital balance at the end of 2001. Furthermore, the balance sheet shows accumulated depreciation[12] and amortization of $461,000. The December 11, 2000 Escala note to Dirk DePree for $100,000, Ex. 9, was not included on this balance sheet. Rather, it was booked as a Renaissance liability because Renaissance had decided to treat it as an investment in Escala. T-VG 2/17 10:20.

54. On January 18, 2002, Vincent Garcia and Mark DePree (and spouses) and Renaissance signed an acknowledgment of ownership in Renaissance. Ex. 101. This document lists

---

[11]On cross examination, Mr. Nagel (the UCC expert witness) admitted that the "Due to Renaissance" account had more characteristics of equity than did Dirk DePree's mortgage. T-RN 2/18 4:35.

[12]Depreciation is a non-cash outlay, yet is considered an expense. See, e.g., Burress v. Standard Fire Ins. Co., 642 F.Supp. 62, 66 (N.D. Miss. 1986)(Cash flow and income are different. Due to depreciation, a company can have positive cash flow but negative income.)

all members and their ownership interests as of that date.

55. Exhibit 17 is Escala's 1/31/2002 balance sheet. It shows a negative equity of $408,000.

56. In February 2002 Vincent Garcia was unwilling to loan any further money to Renaissance because of a growing conflict with the DePree Group. T-VG 2/17 3:20.

57. In February 2002 no other members of Renaissance were willing to loan money to Renaissance. T-MD 2/22 1:30. See also T-DD 2/22 2:18 (during the entire history of this company no members expressed willingness to loan to Renaissance).

58. On February 1, 2002, Renaissance and the Related Development Entities entered a loan agreement with DFLP[13], Dirk DePree, and Mark DePree for $250,000, to be used for the Hotel, Acropolis, LLC, and Prado Hotel, LLC. Ex. 19. The agreement called for guarantees from each Related Development Entity and a mortgage on specified Acropolis, LLC assets. It also required the parties to execute and

---

[13] Paul DePree negotiated the loan on behalf of DFLP after Mark DePree and Dirk DePree requested the loan. T-MD 2/22 1:18. Part of the decision to make the loan was based on the indemnification agreement, and part based on a desire by DFLP to "tie down" things that hadn't been, which would impact on Renaissance's profitability. Id. 1:25.

Page -28-

deliver an "Affirmation and Confirmation of Restructuring Agreement"[14] (¶5.06a) and an "Agreement for Contribution to Capital and Indemnification" from Escala and Renaissance to Dirk DePree (¶5.07). Renaissance and the Related Development Entities also had to use their best efforts to refinance the Hotel and obtain a release of Dirk DePree's guarantee.

The Board met to discuss this transaction. Vincent Garcia initially resisted the indemnification, but all four directors voted to approve the loan and all four signed off on it. Ex. 100. Exhibit 100 provided that $200,000 of Dirk DePree's collateral would be contributed to Renaissance, increasing his capital account but not resulting in the issuance of any new Renaissance units to him. Renaissance and Escala agreed to indemnify Dirk DePree from all losses incurred if Bank foreclosed on the pledged stock. Paragraph 5 secured the indemnification with guarantees from the Related Development Entities, then set a priority for the source of indemnification

---

[14] Properties had not been transferred to Renaissance on the schedule anticipated. For example, Escala had not been transferred from PI, because Escala owned a liquor license, and had not paid all the gross receipts taxes that it owed because it had always lacked the funds. New Mexico laws require taxes to be paid as a condition for the transfer of a liquor license.

payments: 1) membership units of Renaissance with a fair market value of collateral taken by Bank, 2) if not paid by #1, then proceeds from the sale of certain condominium units, and 3) to the extent not paid by #1 or #2, by replacement collateral.

Vincent Garcia testified that he thought the Agreement for Contribution to Capital and Indemnification was inappropriate. First, he felt that this was "extracted" by the DePree Group in exchange for the loan. Second, he felt it was not proper to be indemnified for a "capital contribution." T-VG 2/17 10:30. He did admit, however, that the Board approved the entire loan transaction. Ex. 19. <u>See also</u> T-VG 2/17 10:35.

Tilden Drinkard testified that he voted to approve the loan in its entirety because, without it, Escala would be facing immediate financial ruin and would be "dead in the water." T-TD 2/18 9:25.

59. On February 1, 2002, Alan Hall, Renaissance's attorney, emailed the Board regarding the proposed Agreement for Contribution to Capital and Indemnification. Ex. 18. Exhibit 18 was admitted not for its contents or truth of its contents, but only to establish that the Board had legal advice before the vote. <u>See also</u> T-TD 2/18 12:15

(Members of the Board had legal advice on this
indemnification agreement before the meeting, then voted
in favor of it.)

60. It was Mark DePree's idea to have the $200,000 converted
to equity. T-MD 2/16 2:25.

61. Vincent Garcia testified that, after the February 2002
loan to Renaissance the management of Renaissance
changed. He felt increasingly excluded from decisions
and access to the properties and records. He claims that
Mark DePree and Dirk DePree were making decisions on
their own in violation of the operating agreement. Both
he and Tilden Drinkard expressed their concerns. T-VG
2/17 11:15. See also, below on October 3, 2004.

62. In or around February, 2002, the Bank claimed that
Vincent Garcia was in default on his line of credit for
Factors Plus. Vincent Garcia denied there was a default.
T-VG 2/17 3:25. Mark DePree testified that the Bank
threatened to default Escala if Factors Plus was not
brought current. T-MD 2/16 2:15; T-VG 2/17 3:25; T-TD
2/18 1:45. Vincent Garcia did not recall if this problem
had anything to do with the February 1, 2002 loan
agreement. T-VG 2/17 3:25.

63. During September, 2002, Dirk DePree and Mark DePree obtained a bank loan in the amount of $150,000 from New Mexico Bank and Trust company in their own names, put the money into the bank building for a model unit, and paid for advertising.  T-MD 2/16 2:40; T-VG 2/17 4:17. Vincent Garcia testified that both DePrees intended that Renaissance would repay it.  Id.

Tilden Drinkard's testimony elaborates.  He testified that after 9/11/2001 everyone agreed that a boutique hotel concept would not work for the bank building, and that Renaissance decided to turn it into condominiums.  T-TD 2/18 10:12.  Vincent Garcia recommended Dana Crawford, a marketing person, and later engaged her to organize a gala event/open house of the bank building with Mark DePree and Dirk DePree.  Id. Shortly before the event was to take place, Tilden Drinkard learned that there was no model unit to show the estimated 600 guests.  Id. at 10:15.  He thought this was "madness."  Id.  On cross examination, Tilden Drinkard admitted that he believed the building needed a model unit and that the companies needed money to do it, so Mark DePree and Dirk DePree financed the project in their own names.  Id. 11:34.

Case 04-17376-s11    Doc 194    Filed 03/08/05    Entered 03/08/05 16:11:00 Page 33 of 114

Mark DePree also testified regarding this issue. In mid-September the Board told Mark DePree and Dirk DePree that they could not proceed with the gala event without a model unit. T-MD 2/16 2:43. So, the DePrees borrowed the necessary funds from New Mexico Bank and Trust personally, to construct the model unit and satisfy Vincent Garcia's and Tilden Drinkard's anxiety. Id. All the funds went into the Central 219, LLC[15] checking account and most of it was used for Central 219, LLC. Id. 2:45. Some funds went to Escala during the winter months. Id. None of the funds went to either Mark DePree or Dirk DePree. Id.

There was no evidence presented that the DePrees hid any of this from the Board or that this was not a proper business expense. The Court finds that this is not evidence of bad faith or breach of duty. The witnesses generally agreed that the DePrees were later repaid when Renaissance sold the entire building as a single asset. This transaction did not involve Escala.

_____

[15]Central 219, LLC is apparently yet another related LLC. 219 Central Avenue is the old bank building. When asked if Central 219 owned the unit, Mark DePree said that that was "contemplated." See supra Finding 24 (Renaissance owned the bank building.)

64. On October 3, 2002, Vincent Garcia and Tilden Drinkard

sent Mark DePree and Dirk DePree a letter expressing

their concerns about the latters' actions taken in

violation of the Renaissance operating agreement.  Ex.

25.  This letter makes no reference, however, to any

unauthorized transactions on behalf of Escala.  On cross

examination, Vincent Garcia stated that there were many

unauthorized contracts, but he could not name or identify

one.  T-VG 2/17 3:46.  He also did not know if any of

these contracts involved Escala.[16]  Id. 4:10.  He thought

some sales contracts involved Acropolis, LLC

condominiums, but then said that none of those actually

closed.[17]  Id.  Later, however, Vincent Garcia testified

that in fact one Acropolis sale did close.  Id. 4:20.

---

[16] Mark DePree testified that he could recall no contract
entered into on behalf of Escala unilaterally before he was
sole manager.  T-MD 2/22 1:40.  Dirk DePree testified that he
never entered a contract on behalf of Escala.  T-DD 2/22 2:25.

[17] Mark DePree testified that he never sold any
condominiums in either the Acropolis project or the bank
building without authority of the four members of the Board.
T-MD 2/22 1:40.  Dirk DePree testified that he never sold any
condominiums without Board authority, and that no condominiums
in the bank building were ever sold.  T-DD 2/22 2:25.  He also
testified that, as for Acropolis, the Board had delegated him
the duty to get them sold.  None were sold without permission
of the Board however.  Id. 2:30.  In any event, none of the
items sold were Escala assets.

Page -34-

Tilden Drinkard testified that Dirk DePree entered one sales contract for a unit of Acropolis without Board authority. T-TD 2/18 11:30. The Board ratified the contract and the sale closed. Tilden Drinkard also testified that Dirk DePree entered a second contract to sell an Acropolis unit to Attorney A. Sanchez, but the unit had been previously deeded to Vincent Garcia as payment of a developer fee. Id.; T-DD 2/22 2:30. Attorney Sanchez sued, and the case was settled for $10,000 or $15,000. T-TD 2/18 1:45. Dirk DePree believed it settled for $10,000, and that this amount was paid by Mark DePree, Dirk DePree and Vincent Garcia individually. T-DD 2/22 2:33. Neither Escala or Renaissance paid anything. Id. The UCC did not introduce any documents that support any claims that Mark DePree or Dirk DePree entered unauthorized contracts on Escala's behalf, or of any damage caused therefrom[18]. In fact, Exhibit 11 appears to contradict the theories behind these claims. Exhibit 11 contains selected minutes from weekly Renaissance Board meetings, many of which contain specific delegations of authority to all

_____

[18]Tilden Drinkard also testified that he did not contend that Dirk DePree benefitted from entering any alleged unauthorized contracts without authority. T-TD 2/18 1:50.

Page -35-

the Board members, <u>see also</u> T-TD 2/18 11:25, although there is nothing in the minutes that says conclusively that those delegations of authority were for more than leading the effort on specific operations, with the continuing obligation to report back to and obtain approval from the Renaissance board.  On cross examination, Tilden Drinkard also could not remember any specific contract of Escala entered into by Dirk DePree without authority.  <u>Id.</u> 11:30.

65. Vincent Garcia testified that in December, 2002, the financial condition of both Escala and Renaissance was very poor, that Renaissance had "close to zero" net worth, or maybe negative net worth, and that Escala had negative net worth.  T-VG 2/17 11:30.

66. On February 5, 2003, the Bank's note was due.  Ex. 7-L, Promissory Note, page 1, second paragraph.

67. On March 21, 2003, as had been anticipated since the formation of Renaissance, Prinova assigned all its interests and rights in Escala to Renaissance and resigned as manager.  Ex. 28.  <u>See also</u> T-VG 2/17 3:30.

68. On April 16, 2003, Bank's participant bank obtained an appraisal of the Hotel that placed a value on it of $3.8 million.  Ex. 116.  This exhibit was admitted only for

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 37 of 114

the purpose of showing that an appraisal was done and that subsequent documents relied on it, not as evidence of the actual value.

69. On May 1, 2003, Renaissance held a members meeting at which the DePree Group presented a resolution to amend § 8.02 of the operating agreement to raise capital and to discuss conversion of debt to equity. The minutes appear at Exhibit 31 and the Agenda at exhibit 32. Any resolution would require a 2/3rds vote to pass. T-MD 2/16 11:42. The DePree Group did not have 2/3rds control, and voted for the amendment. Vincent Garcia[19] and Tilden Drinkard abstained. Ex. 31, page 6. An effect of the amendment and any proposal to convert debt to equity would have allowed the DePree Group to gain more ownership of Renaissance without putting in new money. T-MD 2/16 1:45. At the meeting, the members also passed a resolution removing the four person board and appointing Mark DePree as the single manager of Renaissance. Ex. 31, page 6. The members also approved a resolution approving the sale or exchange or

_____

[19] Vincent Garcia testified that he voted against the amendment. On cross examination he stated that he voted against it because it was an attempt by the DePree Group to get his money in as fresh cash. He expected it would cost him about $400,000.

Page -37-

disposition of substantially all assets of Renaissance. Id. page 7.

70. Vincent Garcia testified that after the May 1, 2003 meeting, while no longer a manager of Renaissance, he was still a member with a right of access to information. He requested information many times, but rarely got any. T-VG 2/17 11:35.

71. On June 19, 2003, Mark DePree, as manager of Renaissance, sent a capital contribution notice, pursuant to § 8.02(a) of the operating agreement. Ex. 117. A few members sent in checks, but Mark DePree did not cash them due to controversies surrounding a valuation of Renaissance and issues relating to taking notes for capital in lieu of cash, and issues related to how to treat members interests if capital was not contributed (the formula for interest reduction did not work with a negative valuation of the company). T-MD 2/16 2:48.

72. On July 1, 2003, the Bank, Escala, Vincent Garcia, Mark DePree, Renaissance and Dirk DePree entered an extension and forbearance agreement. Ex. 102. At this time, the note to the Bank was in default and property taxes were delinquent on the Hotel property. In exchange for certain payments, and an executed stock power from Dirk

DePree authorizing the immediate sale of the pledged securities (to be used only in the event of a future default), Bank extended the maturity date to September 10, 2003, or a later date if there was a valid and enforceable contract to purchase or refinance the Hotel.

73. During the Summer of 2003, and especially in August, Dirk DePree and others were assisting in attempts to refinance the Hotel. T-DD 2/22 3:15. Three banks were close to issuing loans, id. 3:19, but none of the sought after refinancing worked out.

74. Sometime during the summer of 2003 Dirk DePree, on advice of his personal attorney, asked Escala for a second mortgage. Mark DePree discussed this with John Baugh, Renaissance's attorney, and he advised that it would not be proper to grant a second mortgage until the Bank seized the collateral. T-DD 2/22 2:20.

75. In the Fall of 2003, Tilden Drinkard was aware of the attempts undertaken to refinance the Hotel, and prepared documents to assist a person that had been hired to obtain the refinance. T-TD 2/18 10:40.

76. In September, 2003, Renaissance, pursuant to its operating agreement, appointed a committee to perform a valuation of Renaissance. The committee used Escala's

CPA firm in an advisory capacity. The committee
consensus was that Renaissance had negative net worth of
$1.976 million. Ex. 37. The Court notes that the
valuation substantively consolidated all subsidiaries
assets and liabilities, without any indication if the
parent Renaissance was actually liable for the
subsidiaries' (all LLCs) debts. However, the committee
did approve this valuation, and the Court accepts it as
is. The exhibit also showed Escala's assets at $3.8
million and liabilities at $4.2 million. It is unclear
if the intercompany "due to's/due from's" were eliminated
in this consolidated valuation.

77. On September 10, 2003, the Bank's extension ended. Ex.
102.

78. In October, 2003 (date unclear), Renaissance assigned
$500K of proceeds from the sale of the bank building to
DFLP and BSCI. Ex. 33 [missing page 2]. See also T-MD
2/16 11:00. Mark DePree believed each received $250,000
at closing.

79. On October 17, 2003, the Bank granted another extension
to December 9, 2003. Ex. 7(O).

80. On October 27, 2003, Vincent Garcia emailed a request for
information to Dirk DePree, demanding certain

information.  Ex. 65.  This email was a response to an earlier email by Dirk DePree to Vincent Garcia explaining why an earlier request for information had been denied. Dirk DePree's email was actually composed by John Baugh, Renaissance's attorney, on behalf of Dirk DePree and set forth concerns about providing this information to Vincent Garcia.  The Hotel was for sale, Vincent Garcia was in competition with one or more other parties to purchase it, and Renaissance purportedly was concerned about an insider obtaining an unfair edge in any acquisition.  While the grounds for denying the information may be questionable, from this exhibit the Court finds no bad faith on the part of the DePrees.

81. In November, 2003, Mark DePree made two appointments with Vincent Garcia and Tilden Drinkard to provide information to them, and they missed both meetings, T-MD 2/22 1:48, although the exhibits suggest that the limitations on time and place imposed by Mark DePree may have contributed to that problem.  Ex. 65.  In general, Mark DePree denies concealing any information from the members.  T-MD 2/22 1:48.  During this period of time, Vincent Garcia was suing Escala.  John Baugh, the

Page -41-

attorney, told Mark DePree that Vincent Garcia should direct requests through his attorney. Id.

82. In December, 2003, there were a series of email exchanges amongst various individuals discussing activities related to refinancing the Hotel. Ex. 107. The parties were expecting a $6.0 million appraisal on the Hotel, and were anticipating obtaining a loan for $3.0 million, which would have been approximately a 50% loan to value ratio. Tilden Drinkard believed reasonable financing could be found. Ex. 107, page 2.

83. On December 9, 2003 the Bank's October 17, 2003 extension ended. Ex 7(O), page 3.

84. In January, 2004, Escala stipulated with Bank to a "drop dead" date of September 30, 2004 on the Hotel note and mortgage. T-MD 2/16 11:18.

85. On or about February 1, 2004, the Bank executed on the stock pledge. Ex.59, page 2.

86. On February 3, 2004, Escala granted a second mortgage to Dirk DePree. Ex. 40. Mark DePree testified that execution of this mortgage was done pursuant to the contract for indemnification executed in February, 2002. T-MD 2/22 1:35. He executed the mortgage on behalf of

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 43 of 114

Escala after seeking legal advice.  Id.  The second

mortgage states, in part:

> This Mortgage secures to Mortgagee: (a) the
> payment and performance by Mortgagor of all
> obligations owed to Mortgagee under that certain
> Agreement for Contribution to Capital and
> Indemnification ...; (b) the payment of all
> other sums, with interest, advanced under
> paragraph 12 to protect the security of this
> Mortgage; and (c) the performance of Mortgagor's
> covenants and agreements under this Mortgage and
> the Indemnification Agreement.  The lien of this
> Mortgage shall not exceed Two Million Dollars
> ($2,000,000.00) at any one time. ...
> ...
> Mortgagor further covenants and warrants as follows:
> 1.  Performance and Payment of Obligations Under
> Indemnification Agreement.  Mortgagor shall
> promptly perform and pay when due all amounts,
> duties and obligations of Mortgagor under the
> Indemnification Agreement.
> ...
> 12.  Protection of Mortgagee's Rights in the
> Property.  If Mortgagor fails to perform the
> covenants and agreements contained in this
> Mortgage, or there is a legal proceeding that
> may significantly affect Mortgagee's rights in
> the property (such as a proceeding in
> bankruptcy, probate, for condemnation or to
> enforce laws or regulations), then Mortgagee may
> do and pay for whatever is necessary to protect
> the value of the Property and Mortgagee's rights
> in the Property.  Mortgagee's actions may
> include paying any sums secured by a lien which
> has priority over this Mortgage, appearing in
> court, paying reasonable attorneys' fees and
> entering on the Property to make repairs.
> Although Mortgagee may take action under this
> paragraph 12, Mortgagee does not have to do so.
> Any amounts disbursed by Mortgagee under this
> paragraph 12 shall become additional debt of
> Mortgagor secured by this Mortgage.
> ...

Page -43-

> 20.  Transfer of the Property or a Beneficial
> Interest in Mortgagor.  Mortgagee may, at
> Mortgagee's option, declare immediately due and
> payable all sums secured by this mortgage upon
> the sale or transfer, without Mortgagee's prior
> written consent, of all or any part of the
> Property, or any interest in the Property.

Dirk DePree filed this Second Mortgage for record on February 3, 2004.  Ex. 59, Foreclosure Judgment on Cross-Claims, finding 4.  The Second Mortgage does not call for monthly payments or have a due date.  However, the Court notes that in January, 2004, Escala had already stipulated with the Bank to a drop dead date of September 30, 2004.

87. Exhibit 42, pages 1 and 2, contain a preliminary balance sheet for Escala as of February 29, 2004.  It reflects a "due to Dirk DePree" of $1.014 million.  This represents the securities taken by Bank under the guarantee.  On this date, Escala's liabilities exceeded assets by $1.5 million.  It shows a Note Payable to Renaissance of $1.36 million.  Accumulated depreciation and amortization is listed at $1.205 million.  The Hotel is valued at $3.8 million based on the April 16, 2003 appraisal.  Ex. 116.

88. On March 29, 2004, Mark DePree, on behalf of Escala, terminated the contract with Tilden Drinkard and Layne

for operation of the Hotel. T-TD 2/18 10:45. Trigild was hired to operate the Hotel.

89. On April 6, 2004, Renaissance and Escala as sellers entered a Purchase Agreement for sale of the Hotel in the amount of $4.5 million. Mark DePree signed the agreement on behalf of both sellers as the manager. Ex. 45.

90. On May 24, 2004, Vincent Garcia sent an email to Mark DePree that offers to buy the Hotel. Ex. 108. It states that it is a "very cursory written offer to be followed by the Definitive Agreement", which may have "de minimus changes." The purchase price was to be $5.75 million, adjusted for final loan balances of Vincent Garcia (and spouse), Tilden Drinkard, Layne, Suzie Fenstermacher, PI, and amounts due to Chaves Grieves Engineers. The minimum cash price would be $4.75 million and be paid at closing. The balance of the price would be paid by tendering membership interests and capital accounts of various members as adjusted for various loans the members made to either Renaissance or Escala. The offer further provided that various lawsuits by members against Escala would be settled for certain amounts listed and that Vincent Garcia and his spouse and the DePree Group would mutually release all claims between them. Closing was proposed to

be September 15, 2004.  Mark DePree responded by asking
for a signed offer.  T-MD 2/22 1:50.

91.  On June 9, 2004, Escala granted a Third Mortgage to Mark
DePree, Dirk DePree, DFLP and BSCI for $500,000 "or so
much thereof as may have been advanced and outsatnding
[sic] under the Note", secured by the Hotel.  The
mortgage was executed by Escala, by Renaissance, its
managing member, by Mark DePree, its managing member.
The promissory note calls for interest at Wall Street
Journal prime plus 2%, and the entire amount is due on or
before September 30, 2004.  Ex. 50.  Mark DePree
testified that before executing this third mortgage he
asked other members to loan money.  T-MD 2/22 1:35.  His
only responses were from BSCI, Dirk DePree and DFLP.  Id.
Previously, Dirk DePree and Mark DePree advanced $70,000
for mortgage payments and sales taxes.  At this time he
thought a crisis was on the horizon.  Escala was
delinquent in taxes and in jeopardy of losing its liquor
license.  Then each of Dirk DePree, BSCI and Mark DePree
loaned $25,000 to Escala.  These are the amounts
represented in the Third Mortgage.  Id.  The members did
not get any additional units for their loans, nor were
their capital accounts credited.  These loans were all

made in anticipation that the Hotel was about to sell for $4.5 million. Id. There is no evidence that Dirk DePree had any control over the execution of the third mortgage.

92. Mark DePree testified that, at the time of the Third Mortgage, Escala had to pay taxes or lose its liquor license and that Escala had no funds. Escala was pursuing the sale and a refinance, but they needed the cash, so he pursued this loan. T-MD 2/16 11:30. Escala had made a capital call in the summer of 2003, but it met with resistance so he did not attempt another one. Id. 11:36.

93. On June 30, 2004, Tilden Drinkard and Layne obtained a temporary restraining order ("TRO") in the 2nd Judicial District Court prohibiting the sale proposed in the April 6, 2004 purchase agreement "unless agreed to by the parties or approved by this Ct. The Next LLC meeting can be recorded by either party." Ex. 53. The TRO was based on a finding that on April 6, 2004, Mark DePree did not have the authority to bind Renaissance or Escala.[20]

94. On July 3, 2004 Renaissance had a members meeting that was taped and transcribed. T-MD 2/16 1:45. The members reinstated Mark DePree's authority and ratified his

---

[20] This twist was not developed in the testimony.

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 48 of 114

actions back to April 16, 2004. The TRO was never lifted, however, and the sale never closed. Id.

95. On September 30, 2004, the 2nd Judicial District Court entered judgment on Bank's foreclosure, and judgment on the Second and Third Mortgagees cross-claims for foreclosure. Ex. 58 and 59 respectively. Exhibit 59 provides, in relevant part:

> [T]he Court having examined the pleadings on file herein and the documents attached to the Crossclaim, having considered the evidence and being fully advised in the premises, finds the following facts:
> ...
> 3. In early February, 2004, [Bank] seized the amount of $1,001,749.00 of [Dirk] DePree's funds pledged by [Dirk] DePree as collateral for the borrowing of Escala with [Bank], and applied it against amounts owed by Escala to [Bank]. Under the DePree Indemnification Agreement, Escala is obligated to pay DePree interest on such amount from the date of seizure at the rate of 10.25% per annum, the same rate as charged by [Bank] under its loan documents.
> [paragraphs 4 through 7 find that Escala delivered the Second Mortgage to Dirk DePree to secure the indemnification obligation, that it was filed with the court as part of the cross claim, that it had been recorded in the county land records, and described the collateral (which, basically, was the Hotel.)]
> ...
> 12. As of September 30, 2004, the amount due [Dirk] DePree under the Indemnification Agreement is $1,001,749.00, in addition to interest of $61,114.12 and attorneys fees of $2,571.00.
> ...
> 14. [Dirk] DePree has been required to employ counsel to collect the amount due under the DePree Indemnification Agreement, to respond to

Page -48-

the Third Amended Complaint in this matter and
to institute and prosecute this cross-claim and
foreclosure of the Second Mortgage, thereby
incurring attorneys fees, which Escala is
obligated to pay to DePree under the DePree
Indemnification Agreement and the Second
Mortgage.

15. [Dirk] DePree is entitled to judgment
against Escala in the full amount of the
indemnification obligation, together with
interest thereon, attorneys fees, costs of
collection and all other amounts due.

16. The lien of [Dirk] DePree under the
Indemnification Agreement and the Second
Mortgage is a valid lien against the Property,
junior to the lien of [Bank]

...

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as
follows:

...

A.  Cross-claimant [Dirk] DePree shall have
judgment against Defendant Escala, LLC, in the
total sum in the amount of the following:
$1,001,749.00 plus interest in the amount of
$61,114.12 plus interest at the rate of $258.58
per day from and after September 30, 2004, until
entry of this Judgment, plus attorneys fees,
fees, expenses and costs in the amount of
$2,571.00, for a total Judgment of
$1,065,434.12.

B.  The unpaid portion of [Dirk] DePree's
Judgment shall bear interest at the rate of
interest of 10.25% from the date of entry of
Judgment until the Judgment is paid in full.

C. [Dirk] DePree is the holder of a valid lien
on the Property described in the Second
Mortgage, junior to the lien of [Bank], but to
which the interest of Escala and the Third
Mortgage Holders herein and all persons claiming
under them are subordinate and inferior.

...

G.  The Indemnification Agreement, Second
Mortgage, ... are hereby ordered foreclosed,
together with all rights in the Property of
Escala and any person claiming by, under or
through Escala...

...
> I. [Dirk] DePree is allowed to bid in the amount
> of his Judgment or any portion thereof at the
> foreclosure sale as the equivalent of cash, if
> and only if, the bid includes payment of cash
> for the full amount owed by Escala to [Bank]...
> J.  In the event [Dirk] DePree is the successful
> bidder, in addition to the cash bid pursuant to
> Paragraph I, above, he is entitled to apply all
> or part of his Judgment in payment of the
> purchase price.

96. On October 8, 2004, one creditor filed an involuntary

bankruptcy petition against Escala.  Doc. 1.

97. Sometime in October, 2004, Dirk DePree prepared a

document to circulate to potential investors who might be

interested in forming a deal to acquire the Hotel[21].  Ex.

72.  Dirk DePree testified that he called it "Talisman

LLP", but that this entity was never formed, the document

was just an attempt to get prepared to protect himself if

the Bank's foreclosure went through.  T-DD 2/22 3:25.

The proposed structure would be to purchase Hotel for

$4.0 million, $3.0 million of which would be cash by an

investor, and $1.0 million from Dirk DePree's Second

---

[21]Dirk DePree at first denied he ever did a statement for
an entity named Talisman regarding the Hotel.  T-DD 2/22 3:25.
Then he admitted that he prepared the document and circulated
it, but that Talisman was not in existence.  Both Vincent
Garcia and Dirk DePree exhibited some memory lapses and
discrepancies in their testimony, but the Court does not
consider that either of these witnesses was not credible or
straightforward.

Mortgage.  Ex. 72, page 2.  At this time the Bank's mortgage was $2.4 million.  Dirk DePree testified that the excess cash after paying the mortgage was intended to be distributed to unsecured creditors.  T-DD 2/22 3:40. The UCC urges the Court to deem this an admission by Dirk DePree that his guarantee was intended to be equity.  The Court declines.  This is simply a last ditch effort by Dirk DePree to preserve his position and not lose everything.

98.  Exhibit 110 is a schedule of Renaissance's unsecured debts and Escala's secured debts as of October 26, 2004. Total debts were $6.2 million, including Dirk DePree's Second Mortgage listed at $1.04 million, loans from Mark DePree of $544,000, and loans from Dirk DePree of $277,000.  The $6.2 million figure includes all of Escala's mortgages and unpaid taxes in the amount of $3.85 million.

99.  On November 4, 2004 the alleged debtor Escala voluntarily converted to Chapter 11.  Docs. 18, 19.

100.  On November 29, 2004, Escala filed its statements and schedules.  Escala lists Renaissance as an unsecured creditor in the amount of $1.36 million.

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 52 of 114

101.     On December 2, 2004, Dirk DePree filed proof of claim #2, in an amount to be determined, secured by real estate, and evidenced by the Foreclosure Judgment.  The Foreclosure Judgment, ex. 59, is also attached to the proof of claim as Exhibit G.  The Judgment, dated September 30, 2004, is in the amount of $1,001,749.00, plus accrued interest of $61,114.12, and attorneys fees of $2,571.00 (Finding 12).  Interest accrues on the principal amount at the rate of 10.25% per year (Finding 3), or $258.58 per day (Decretal A).  Therefore, Dirk DePree's claim is for $1,065,434.12 plus interest at the rate of $258.58 per day from and after September 30, 2004 (Decretal A).  Under his indemnification agreement and the second mortgage Dirk DePree is entitled to costs and reasonable attorneys fees for defending his rights.

102.     On December 17, 2004, Vincent Garcia wrote to Mark DePree complaining about the performance of Trigild, the operator of the Hotel.  Ex. 61.  The letter refers mostly to documents not in evidence.  Even if it were the case, as alleged, that Trigild mismanaged the Hotel and its hiring by Mark did

little or no good for Escala, there is no allegation that Mark DePree acted in bad faith, and so the Court does not find the letter probative or relevant.

103.     The Court finds that the expert opinion offered in this case by Roger Nagel, Ex. 62, and its supporting documents, Exs. 66-69, are entitled to relatively little weight[22].

104.     Roger Nagel testified that he not quantify the alleged harm to creditors from Dirk DePree's conduct.  T-RN 2/18 5:00.  No other exhibit calculated damages.

**THE EXPERT OPINION**

---

[22] In fairness to the expert Mr. Nagel, the Court is not saying that his services were of no value, or that he was "wrong". This matter came before the Court on a fast-track pace, by mutual agreement of all parties.  The application to employ him was filed on January 13, 2005.  Doc. 130.  He did not have all the documents that were presented to the Court during the four-day trial, nor the benefit of the pre- and post-trial briefs, nor the benefit of the four days of testimony before preparing his report.  The Court, with the luxury of having all the evidence and arguments presented before considering the report, simply disagrees with the statement of issues and conclusions.

Roger C. Nagel, CPA, was qualified as an expert witness[23] for the UCC, on the sole issue of whether transactions should be classified as debt or equity.[24]  He explained that there are

---

[23]Rule 702, Fed.R.Evid., provides:

> If scientific, technical, or other
> specialized knowledge will assist the trier
> of fact to understand the evidence or to
> determine a fact in issue, a witness
> qualified as an expert by knowledge, skill,
> experience, training, or education, may
> testify thereto in the form of an opinion
> or otherwise.

The rule allows for the admissibility of expert testimony to aid the Court in understanding the evidence or deciding an issue of fact.  Rule 702, however, does not make the testimony of the expert, even if uncontradicted by another expert, conclusive as to the issue testified to.  Security First National Bank of L.A. v. Lutz, 322 F.2d 348, 355 (9th Cir. 1963). The Court is free to make its own determination of the issues, regardless of the expert testimony.  "The rule [Rule 702] does not mean that the trier of fact must rely upon expert testimony which is unsatisfactory or that the trier of fact is precluded from making an independent determination of the facts, regardless of how complicated or 'specialized' the subject matter may be."  Parents in Action v. Hannon, 506 F.Supp. 831, 836 n. 3 (N.D. Ill. 1980).
In re Opelika Manufacturing Corp., 66 B.R. 444, 450 (Bankr. N.D. Ill. 1986).

[24] The UCC also attempted to qualify him as an expert on whether the debts in this case should be equitably subordinated.  Dirk DePree objected, and the Court sustained this objection because the question of fairness or equitable subordination is a legal conclusion to be reached by the Court, not an expert witness.  See, e.g., United States v. Simpson, 7 F.3d 186, 188 (10th Cir. 1993):

> The [Federal Rules of Evidence] do not, for example,
> allow an expert to offer testimony that merely tells

(continued...)

Page -54-

two approaches to answering this question: 1) if a CPA is advising on the fair presentation of financial data under generally accepted accounting principles ("GAAP") he or she looks to GAAP principles, Financial Accounting Standards Boards pronouncements, and Financial Accounting Concepts Statements ("FACS"); or, 2) if the CPA is advising on tax or regulatory issues, he or she looks to the tax laws and regulations. Mr. Nagel analyzed the facts in this case using the GAAP approach. He paid particular reference to FACS 2 and 6. FACS 2 deals with the validity of financial statement data and the notion of "substance over form." FACS 6 deals with the characteristics of debt versus equity.

Mr. Nagel was first asked to look at the series of transactions between the DePree Group and Escala or Renaissance from August, 2000 to date, to opine on whether the transactions were more characteristic of debt or equity. Second, he was asked to examine the "fairness" of the

---

[24](...continued)
the jury what results they should reach ... Expert testimony of this type is often excluded on the grounds that it states a legal conclusion, usurps the function of the jury in deciding the facts, or interferes with the function of the judge in instructing the jury on the law. See, e.g., Specht v. Jensen, 853 F.2d 805, 808 (10th Cir. 1988), cert. denied, 488 U.S. 1008, 109 S.Ct. 792, 102 L.Ed.2d 783 (1989).

treatment of those transactions on the unsecured creditors. He prepared a report ("Report") on January 26, 2005, which was admitted into evidence as Exhibit 62. The Report follows the two questions presented. Part 1 of the Report deals with the debt/equity question. Part 2 discusses the inequitable conduct on the part of the DePree Group that Mr. Nagel states benefitted the DePree Group at the cost of others, hence justifying subordination. The Court did not consider Part 2 of the Report.

Part 1 of the Report is entitled "**Characteristics of equity investments (versus mortgage loans).**" It identifies eight characteristics that determine whether "cash advances[25] to a business enterprise" are equity investments or "loan proceeds." The issue in this opinion is whether Dirk DePree's second mortgage lien on the Hotel can be credit bid at an upcoming auction of the Hotel and whether Dirk DePree's guarantee to a third party financial institution should be recharacterized as equity, or equitably subordinated. While it is true that the DePree Group loaned a great deal of money to Escala, that is not the issue at hand.

1. **"Thin" versus "adequate" capitalization.**

_____

[25]Dirk DePree's second mortgage did not arise from a cash advance to Escala or Renaissance. It resulted from his guarantee of Escala's Bank loan.

The first characteristic discussed is "'Thin' versus 'adequate' capitalization". The Report states that Escala was formed as a wholly owned subsidiary of Renaissance. This is not true. Escala was first owned and managed by PI, which later transferred it to Renaissance. The Report states that Dirk DePree paid nothing for his capital interest in Renaissance, in cash or assets, and provided no services or expertise other than his guarantee. First, as a matter of law, a pledge of collateral to secure another's debt is deemed to be of value to the primary debtor. Second, Mr. Nagel admitted he had no idea of what the value of the ownership interest was that Dirk DePree received. And, the letter agreement[26] for the guarantee provided that Dirk DePree would provide free services. Next, the Report states that Dirk DePree's willingness to expose his personal assets to the claims of creditors suggested that he viewed his action as a capital investment. On cross examination, Mr. Nagel admitted that if the pledge were really equity, it would be available to all creditors. T-RN 2/18 4:00. Dirk DePree's assets were only exposed to the Bank.

---

[26] Mr. Nagel testified that he had never seen the letter agreement. T-RN 2/18 4:40.

The Report next states that the Bank viewed the Escala mortgage as a "risky" loan (because the term was 30 months as opposed to 15 or 20 years), so therefore the Bank viewed Dirk DePree's guarantee as a form of capital investment.  Mr. Nagel never interviewed anyone at the Bank, however.  T-RN 2/18 4:05.  Steven Garrett, the Bank President testified that none of the documents related to the Bank loan required or considered the pledge to be a contribution to equity.  T-SG 2/17 9:30.  Nor can the Court infer such an intent from the documents.  Later, Mr. Garrett testified that the Bank had no objection to Dirk DePree's second mortgage.  Id. 9:40.

The Report states that the property had a history of poor cash flow and profit.[27]  The Report provides no disclosure of the information on which this opinion is based and cites no authority, other than the next sentence: "It was, after all, disposed of in a bankruptcy proceeding."  Bankruptcy does not necessarily mean a history of poor cash flow and profit.  Tilden Drinkard testified, however, that the pro formas showed they could make the Hotel acquisition work.  T-TD 2/17 4:50.

_____

[27] The Report in this case conforms to the requirements of Fed.R.Civ.P. 26(a)(2)(B).  This rule requires that an expert's report "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions..." (Emphasis added.)

The Report states lending institutions ordinarily do not lend more than 75% of value on a property,[28] that Escala did not have sufficient equity, and that other lenders would have required capital infusions.[29] Evidence at trial showed that the Bank made the loan based on an appraisal that showed there was a 65% loan to value ratio. Mr. Nagel admitted on cross examination that he learned this after his Report. T-RN 2/18 4:16. Therefore, the 75% was met. Id.

The Report referenced that Escala litigated claims from the bankruptcy that were assumed as part of the purchase price. The Report took this as evidence of an inability to pay. At trial, the evidence showed that many of these debts were disputed; some were considered frivolous. T-VG 2/17 3:45. Mr. Nagel admitted that nonpayment of disputed or

---

[28] Mr. Nagel cites the U.S. Small Business Administration "Frequently Asked Questions" website for this proposition, and attached a copy of the relevant frequently asked question. Question: "How much money do I need to have in order to qualify for an SBA loan?" Answer: "A borrower's capital contribution generally must be one-fifth to one-third of the total project cost." First, there is no evidence that this was an SBA loan. The Report does not disclose why SBA norms would apply. Second, the website does not say what the Report represents it as saying. Rather, the website states that a range of 66% to 80% is the general norm.

[29] The Report provides no disclosure of the information on which this statement (of what other lenders would have done) is based and cites no authority.

Page -59-

frivolous debts is not evidence of inability to pay.  T-RN 2/18 4:20.

The Report discusses the "common standards in commercial lending" "debt to equity" ratios and discusses Escala's poor showing.  Neither the Report or testimony clarified the relative importance of the debt to equity ratio, and this left the Court with many questions[30].  The Report then computes the first end of year debt to equity ratio after an "unexpected operating loss".  It is unclear how the ratio after a later unexpected loss impacts on an initial undercapitalization determination, or how this could impact an initial lending determination.

The Report incorrectly states that there were never any additional calls for capital infusions from investors.  See Ex. 117.

---

[30] "Financial strength can be evaluated through the application of a variety of financial ratios. These ratios can be categorized as liquidity ratios, coverage ratios, leverage ratios, operating ratios, and specific expense item ratios. In applying a ratio analysis, not all ratios are necessarily applicable to a particular entity, and the applicable standards may vary from industry to industry.  It must also be kept in mind that in addition to the mathematical aspect of the analysis, other factors such as the nature and quality of the assets need to be considered."  In re Snyder, 105 B.R. 898, 903 (Bankr. C.D. Ill. 1989).

The Report finds that there was insufficient working capital from inception.  The Court agrees.  Exhibits 66-69 support this conclusion.

2.  **Intent of the parties.**

The second part of the Report opines on the intent of the parties in connection with the Bank guarantee.  It starts by citing an affidavit from Vincent Garcia as president of the managing member of Escala[31], that "it was never the intent of the parties for Dirk DePree's guarantee to be repaid as if it were a loan in the event the investments were liquidated for the benefit of the bank."  Paragraph 8 of that affidavit states, however:

> During the course of the negotiations for the collateral pledge, it was never discussed, considered or agreed that any portion of the collateral would be treated as a loan from Dirk DePree to Renaissance, Escala or any of the subsidiary companies or that Dirk DePree would be entitled to be repaid any portion of the collateral or would receive any further consideration or compensation in the event the bank seized all or any of the collateral.

Ex. 62, endnote D (emphasis added).  The affidavit does not state anything about the intent of the parties.  All it states is that it was "never discussed, considered or agreed."

---

[31] The affidavit makes clear that Mr. Garcia was the president of the managing member of Escala in August 2, 1999.  Mr. Garcia has not been managing member of Escala or on the Board of Renaissance since May 1, 2003.

Furthermore, if Dirk DePree acquired certain rights as a matter of law pursuant to the guarantee agreement, Vincent Garcia's intentions about those rights are irrelevant. <u>See</u> discussion below regarding subrogation.

The Report then states "The fact that no loan application or note or mortgage was drawn up at the time to document such an agreement is a corroborating indicator of that fact." This is an unfounded statement based on an incorrect legal assumption. The entire loan package with the Bank was thoroughly documented, including Dirk DePree's guarantee. There is no legal requirement that a borrower give a potential guarantor a loan application. There is no legal requirement that a borrower give a note to the guarantor at the time of the guarantee; no liability arises until the borrower defaults on the obligation to the creditor. <u>See</u> discussion below regarding subrogation. At the inception of the guarantee there is nothing to give a note for. Similarly, there is no need to secure a non-existent note with a mortgage when nothing is due.

The Report then states "Numerous borrowing transactions in the ordinary course of business took place from August 1, 2000 until February 1, 2002 in which there was no mention to other creditors that Dirk DePree had a priority claim against

Escala's assets as a creditor due to his limited guarantee."
First, the Report provides no disclosure of the information on
which this statement is based. At trial, there was no
evidence of any borrowings between August 1, 2000 and February
1, 2002, other than a loan from Dirk DePree himself, Ex. 9,
and the February 1, 2002 loan from assorted members of the
DePree Group[32], Ex. 19. Second, during this period of time,
Dirk DePree had only a contingent claim for subrogation. <u>See</u>
discussion below regarding subrogation. So, there was in fact
no failure to disclose additional liabilities; to the extent
Dirk DePree would have a claim in the future, Bank's claim
would be reduced by the same amount with no net effect to
creditors.

The Report finds it significant that "[I]t was not until
eighteen months after the commitment to the bank that [Dirk]
DePree began a course of action to protect his personal assets
in the form of a recharacterized loan" because he now knew of
the operating performance and negative cash flow, and by this

---

[32] Various financial statements showed loans from Susie
Fenstermacher, Tilden Drinkard, and perhaps other insiders.
The Court has not reviewed these statements to attempt to
determine the dates of the loans. But, it is clear that Ms.
Fenstermacher, Tilden Drinkard and all insiders were aware of
Dirk DePree's guarantee, albeit perhaps not the legal
ramifications thereof.

time he had obtained control through a "series of insider activities."

First, the Report provides no disclosure of the information on which this opinion about insider activities is based.  Second, there is no evidence that Dirk DePree was attempting to recharacterize anything.  He had suretyship rights from the inception of the loan.  <u>See</u> discussion below regarding subrogation.  All evidence suggests he was, at all times relevant, only attempting to get acknowledgment of those rights, and nothing more.

The Report states that until the pledge was executed on by the Bank, the books and records consistently revealed Dirk DePree as an equity owner, not a creditor.  As a matter of law, he was not a "creditor" but only a contingent creditor. <u>See</u> discussion below regarding subrogation.  To the extent he would later become a creditor, Bank's claim would be reduced by the same amount, with no net effect on third-party creditors.

3.  **<u>The name given to documents evidencing the nature of the cash advances.</u>**

First, the Court again finds that this transaction was not a "cash advance."  The Report finds that the "lack of formality" in documenting the guarantee, and the books and records reflection of Dirk DePree's interest only as a member

Page -64-

with an equity interest, suggest that it was not really a loan. First, the Bank's loan and guarantee were fully and properly documented commercial loan agreements, and all were approved by the Board. Nothing more was needed. Second, the books and records properly showed only Dirk DePree's equity interest; until the Bank exercised its rights under the stock pledge Dirk DePree was a contingent creditor with no amount owed. In fact, the records showed that Dirk DePree's capital account was not credited when he pledged the stock. T-RN 2/18 4:45. Had a liability been shown on the books, it would have been incorrect because the total amount owed was $3.5 million at all times relevant, not $3.5 million to the Bank and an additional $1 million to Dirk DePree. Mr. Nagel admitted this on cross examination. T-RN 2/18 4:45.

The Report finds it significant that the original first mortgage prohibited additional borrowing without its prior approval. A guarantee is not "additional borrowing". A guarantee does not create a new loan. See discussion below regarding subrogation.

4. **Increased participation in management as a result of the cash advances.**

This portion of the Report discusses Dirk DePree's connection to the business (through his brother) before he guaranteed the debt, and his later increased involvement in

Page -65-

management.  It concludes that after May 31, 2001, the insiders that were part of the DePree Group operated the business in a manner that resembled sole ownership.  The testimony at trial supports the conclusion that Dirk DePree had somewhat increased involvement in management over time, although he was an integral part of the management structure starting no later than September 2000.  Ex. 11, page 3.  However, the evidence at trial did not support a finding that the DePree Group ran the business as a sole proprietorship after May 31, 2001 (the date the First Amended and Restated Operating Agreement of Renaissance became effective).  Instead, the Board was officially recognized on that date, and evidence at trial showed that the Board operated after that time.

5.  **The ability to obtain loans from outside lending institutions.**

Although it appears likely that Escala was unable to obtain financing for the Hotel elsewhere, that fact as such was not established by the testimony and evidence at trial.

6.  **Presence or absence of a fixed maturity date.**

The Report does not state that the guarantee agreement did not have a maturity date, but the Court so finds.  The Report states that the Feb. 2, 2002 indemnification agreement

and the second mortgage, given after the stocks were taken, do not have a maturity date.  On February 2, 2002 Escala owed no debt to Dirk DePree because the stocks were not taken until 2004, therefore no maturity date was needed, or possible. When the second mortgage was given in February 2004, after the stocks were taken, Escala had already agreed to a drop dead date with the Bank of September 30, 2004.  This suffices to establish an effective maturity date on the second mortgage.

7.  **Source of repayments of principal and interest.**

The Report notes that the second mortgage did not call for payments of principal and interest as would be expected in a traditional borrowing environment.  It states that the only source of liquidating this debt was from net operating results, and that due to insufficient cash flows no payments were in fact made.  The Court disagrees with this conclusion. The Bank loan was for thirty months, and trial testimony suggests an intent to refinance quickly within less than that time, and perhaps in as little as twelve months.  See supra Findings 33, 50.  The Bank's loan was to be paid by a refinance.  Dirk DePree's claim, as derivative of the Bank's (either through subrogation or as a second mortgage), would also be satisfied by refinancing.

8.  **The failure of the debtor to repay on the due date or to seek a postponement.**

The Report states that because there was no maturity date on the second mortgage, there was no date upon which Dirk DePree could assert his rights to begin legal proceedings. However, the Extension Agreement, Ex. 102, externally imposed that date.  The record also shows that Escala sought and obtained postponements on the Bank's obligation.  Furthermore, Dirk DePree actively participated in Bank's foreclosure case, which is inconsistent with an equity position.  T-RN 2/18 4:53.

In sum, the Court has made an independent determination of the facts and placed relatively little weight on the Report.

CONCLUSIONS OF LAW

Before turning to the three main issues in this case, the Court will address the UCC's request at closing argument and in its post-trial brief that the Court should consider the history of Escala and Renaissance as a whole and not look in isolation at Escala.  The Court declines.  Under New Mexico law, each LLC is a separate legal entity.  § 53-19-10(A) NMSA 1978.  The property of an LLC is owned by the LLC, not its members.  § 53-19-29(A) NMSA 1978.  The debts, obligations and liabilities of an LLC are solely the debts, obligations and

Page -68-

liabilities of the LLC. § 53-19-13 NMSA 1978. No member or manager of an LLC shall be obligated personally for any debt, obligation or liability of the LLC solely by reason of being a member or manager of the LLC, but a manager may be liable for an act or omission if there is otherwise a basis for liability. Id.

Renaissance may have claims against its Board or the Board members for any damages it sustained. These claims would be the property of Renaissance, however, not of Escala. And, Escala lacks standing to pursue claims on Renaissance's behalf. If Escala has claims against the Board or the Board members, it must be for damages sustained by Escala on causes of action that belong to Escala. See Scott v. AZL Resources, Inc., 107 N.M. 118, 121-22, 753 P.2d 897, 900-901 (1988). (Every corporation is a separate legal entity. A subsidiary and its parent are separate entities. In order to pierce the corporate veil to hold a parent corporation or its stockholders liable, one must show "improper purpose" before considering other factors. Ownership of a subsidiary or commonality of the boards of directors is not sufficient to ignore the formalities. The party must also demonstrate the financial setup of the corporation is a sham that causes injustice. However, if each business conducts business in its

own name, receives income in its own accounts, and each owns valuable assets, this demonstrates that they were not sham corporations. The fact that a company loses money is not enough to disregard the corporate entity; the losses must result from mismanagement and fraudulent manipulation. Supplying money to a losing business is not an improper purpose.) Based on <u>Scott</u> the Court cannot find from the evidence at trial that Escala and Renaissance are basically one entity. Therefore, the Court will respect the formalities and determine if Escala was damaged, and if Escala through its unsecured creditors committee is entitled to the relief it requests. The Court will, however, consider all the evidence presented at trial to reach its decision.

1. **<u>Subrogation</u>.**

     Subrogation is a term used by the law to describe the remedy by which, when the property of one person is used to discharge a duty of another or a security interest or lien upon property of another, under such circumstances that the other will be unjustly enriched by the retention of the benefit thus conferred, the former is placed in the position of the obligee or lienholder. Subrogation does not spring from contract although it may be confirmed or qualified by contract. Rather, it is a rule that the law adopts to compel the eventual satisfaction of an obligation by the one who ought to pay it. In the suretyship context, subrogation provides a secondary obligor who performs the secondary obligation with the obligee's rights with respect to the underlying obligation as though that obligation had not been satisfied. See § 28. Since

the underlying obligation has been satisfied, no interest of the obligee is prejudiced by permitting the secondary obligor to enforce the obligee's rights, and the resulting benefit to the secondary obligor effectuates the rights of the secondary obligor against the principal obligor (§§ 21-26). Subrogation is often called an equitable assignment or an assignment by operation of law.

Restatement (Third) of Suretyship & Guaranty ("Restatement") § 27 cmt. a. "[P]robably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed. This rule, widely applied in this country [is] generally known as the right of subrogation." Pearlman v. Reliance Ins. Co., 371 U.S. 132, 136-37 (1962)(footnotes and citations omitted.) A guarantor is "a favorite of the law," and entitled to a strict construction of his or her agreement. Levenson v. Haynes, 123 N.M. 106, 112, 934 P.2d 300, 306 (Ct. App.), cert. denied, 123 N.M. 168, 936 P.2d 337 (1997)(quoting Shirley v. Venaglia, 86 N.M. 721, 724, 527 P.2d 316, 319 (1974)). Consequently, the guarantor's liability should not be extended by implication beyond the express limits or terms of the instrument or its plain intent. Id. And, for protection of a guarantor, equitable subrogation is a "highly favored doctrine and is to be given a liberal application." Minnesota Trust Co. of Austin v. Yanke (In re Yanke), 230 B.R. 374, 379 (8th Cir. BAP 1999).

Case 04-17376-s11    Doc 194    Filed 03/08/05    Entered 03/08/05 16:11:00 Page 72 of 114

New Mexico courts apply the principles set out in the Restatement. <u>Venaglia v. Kropinak</u>, 125 N.M. 25, 30, 956 P.2d 824, 829 (Ct. App. 1998)("[F]or authoritative guidance on the common law of [guarantees] we look to the Restatement [(Third) of Suretyship and Guaranty (1996)]"). <u>See also, e.g.</u>, <u>Levenson</u>, 123 N.M. at 111, 934 P.2d at 305.

A pledge of stock to secure another's debt gives the pledgor ("guarantor") suretyship status. Restatement § 1 cmt. g, illus. 6. Suretyship status gives the guarantor a significant set of rights against both the debtor and the creditor. <u>Id.</u> cmt. a. The guarantor obtains these rights "as a matter of status in the transaction rather than by express agreement." <u>Id.</u> The suretyship status creates two implied contracts: one between the debtor and the guarantor, and one between the guarantor and the creditor. <u>Id.</u>

A breach occurs when the debtor fails to perform its contract to the creditor. Restatement § 22. The debtor has a duty to reimburse the guarantor to the extent the guarantor performs the guarantee. <u>Id.</u>

Restatement § 21(2) states that, upon breach, the guarantor is entitled to relief that will properly protect its rights. This is justified because as between the debtor and the guarantor, the debtor should bear the cost of performance.

Restatement § 21 cmt. a. The guarantee serves as an inducement for an action by the creditor, and is beneficial to the debtor. Id. The guarantor can enforce performance by the debtor upon breach. Restatement § 21 cmt. i. It is inequitable for the guarantor to be compelled to suffer the inconvenience and temporary loss that performance under the guarantee will entail. Id. Therefore, absent defenses of the debtor to perform its duties, the guarantor is entitled to appropriate relief protecting its interests. Id. This is called "exoneration." Id. Exoneration should properly protect the interests of the debtor, the creditor, and the guarantor. Id. cmt. k. "Among the courses open to a court are ... to require that the [debtor] give the [guarantor] adequate security for its ultimate reimbursement." Id.

Restatement § 27 discusses when a guarantor has subrogation rights: "(1) Upon total satisfaction of the underlying obligation, the [guarantor] is subrogated to all rights of the [creditor] with respect to the underlying obligation to the extent that performance of the [guarantee] contributed to the satisfaction." So, under common law a guarantor is not entitled to subrogation rights of the creditor until the underlying obligation is completely discharged. Id. cmt. b.

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 74 of 114

This does not mean, however, that the guarantor must pay the entire remaining obligation himself, or immediately. <u>See</u> <u>Furlong v. Leybourne</u>, 138 So.2d 352, 356 (Fla. Dist. Ct. App. 1962) (Declaratory judgment action declaring that if party should make any payments on bank's mortgage in the future, upon bank's satisfaction, they would be subrogated to extent of payments made and could foreclose at that time.); <u>Nat'l</u> <u>Surety Corp. v. Cherokee County Bank</u>, 57 F.Supp. 370, 372 (N.D. Ala. 1944)(Rule of full payment is satisfied if the creditor is paid in full, even if part of the debt was paid by the debtor or others.); <u>Fowler v. Lee</u>, 106 Fla. 712, 716, 143 So. 613, 614 (1932)(same.); Richard A. Lord, 23 Williston on Contracts § 61:54 (4th ed.)("Williston")("The surety's right of subrogation does not ordinarily arise until the debt is paid in full... It is not necessary, however, that the surety make full payment. It is sufficient that any unpaid balance for which the surety was not obligated has been paid to the creditor by the principal or some other person properly paying it.")(Footnotes omitted.)

The rule requiring full payment is for the sole protection of the creditor. <u>Mid-States Ins. Co. v. American</u> <u>Fidelity and Casualty Co.</u>, 234 F.2d 721, 731 (9th Cir. 1956); <u>Fowler</u>, 106 Fla. at 715-16, 143 So. at 614. This allows the

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 75 of 114

creditor to remain in full control of the debt and its collection.  Mid-States Ins. Co., 234 F.2d at 731; Pep'e v. McCarthy, 249 A.D.2d 286, 287-88, 672 N.Y.S.2d 350, 352 (N.Y. App. Div. 1998).  Consequently, the rule may only be invoked by the creditor.  Pep'e, 249 A.D.2d at 288, 672 N.Y.S.2d at 352; Benschoter v. First Nat'l Bank of Lawrence, 218 Kan. 144, 155, 542 P.2d 1042, 1051 (1975); Schmid v. First Camden Nat'l Bank & Trust Co., 130 N.J. Eq. 254, 271, 22 A.2d 246, 256 (N.J. Ch. 1941).  And, even the creditor may not invoke the rule if there would be no prejudice to the creditor.  Missouri ex rel. Paden v. Carrel, 597 S.W.2d 167, 177 (Mo. Ct. App. 1979);  Mutual Life Ins. Co. of New York V. Grissett, 500 F.Supp. 159, 163 (M.D. Ala. 1980).  See also United States Fid. & Guar. Co. v. Maryland Cas. Co., 186 Kan. 637, 644-45, 352 P.2d 70, 77 (1960)(If creditor would not be deprived of anything, the rule regarding full payment has no application.) Compare 23 Williston § 61:54 ("In a case where a surety partially discharges a debt secured by a first mortgage, the granting of subrogation rights to the surety, without the surety having paid the entire first mortgage debt, is not prejudicial to the rights of the holders of junior liens."); and Johnson v. Sowell, 80 N.M. 677, 680, 459 P.2d 839, 842

(1969)(Court enforces partial subrogation of mortgage because courts of equity always recognize partial assignments.)

Finally, the protection of the rule requiring full payment can be waived if the creditor acquiesces to the subrogation. <u>Thornton v. Syracuse Savings Bank</u>, 961 F.2d 1042, 1047 (2nd Cir. 1992); <u>Mid-States Ins. Co.</u>, 234 F.2d at 731 ; <u>Benschoter</u>, 218 Kan. at 155, 542 P.2d at 1051. In this case, the Bank explicitly agreed to the recording of the second mortgage. Ex. 41.

Restatement § 28 discusses the rights obtained through subrogation:

> (1) To the extent that the [guarantor] is subrogated to the rights of the [creditor], the [guarantor] may enforce, for its benefit, the rights of the [creditor] as though the underlying obligation had not been satisfied:
> (a) against the [debtor] pursuant to the underlying obligation;
> ...
> (c) against any interest in property securing either the obligation of the [debtor] ... against whom the rights of the [creditor] may be enforced;
> ...
> (2) Recovery under this section is limited as follows:
> (a) the total recovery of the [guarantor] pursuant to subsection (1) may not exceed the [guarantor's] cost of performance of the [guarantee]; ...

"When a [guarantor] is subrogated to the rights of the [creditor] with respect to the underlying obligation, the result is essentially the same as if the [creditor] had

assigned those rights to the [guarantor].  Indeed, subrogation
is often referred to as equitable assignment or an assignment
by operation of law."

Id. cmt. a.  Subrogation treats the guarantor as though its
performance of the guarantee was consideration for an
assignment of the creditor's rights.  Id. cmt. b.  See, e.g.,
Yanke, 230 B.R. at 379 (Payment by a surety is deemed to be a
purchase of the claim from the creditor; although payment
extinguishes the remedy and discharges the security as
respects the creditor, it does not have that effect as between
the surety and the debtor.)  If it is necessary for the
guarantor to have a formal assignment to enforce rights of the
creditor[33], the creditor must execute any instruments necessary
to enable the guarantor to enforce those rights.  Id. Cmt. h.
See also Reimann v. Hybertsen, 276 Or. 95, 98, 553 P.2d 1064,
1065 (1976)(Court orders creditor to assign mortgages to
accommodation maker.)

    The Restatement Third of Property (Mortgages) § 7.6
dictates the same result:

> One who fully performs an obligation of another,
> secured by a mortgage, becomes by subrogation the
> owner of the obligation and the mortgage to the
> extent necessary to prevent unjust enrichment.  Even

_____

    [33] Generally this is not required.  See, e.g., Memphis &
L.R.R. Co. v. Dow, 120 U.S. 287, 301 (1887).

though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.

"The effect of subrogation is to assign the mortgage and the obligation by operation of law; when the mortgage is paid the [guarantor] is entitled to receive upon request a formal written assignment." Id. cmt. a. See also Tiffany, Real Property § 1506.

The right of subrogation does not create a new debt. Putnam v. Commissioner, 352 U.S. 82, 85 (1956):

> The familiar rule is that, instanter upon the payment by the guarantor of the debt, the debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes.

See also Fidelity & Deposit Co. of Maryland v. Hobbs, 144 F.2d 5, 8 (10th Cir. 1944):

> It is well settled that, when a contract of suretyship is made, there arises, in the absence of an express agreement, an implied contract that the principal will indemnify the surety for any payment the latter may make to the creditor in compliance with the contract of suretyship. This implied contract arises when the suretyship is made, and not when the payment is made by the surety thereunder. The relation of debtor and creditor exists between the principal and surety from the time the contract of suretyship is made. The payment relates back to the time when the contract was entered into by which the liability to pay was incurred, fixes the amount of damages for which the principal is liable to the surety and matures the cause of action therefor.

and F.D.I.C. v. Hiatt, 117 N.M. 461, 468, 872 P.2d 879, 886 (1994)(citing Putnam, 352 U.S. at 85)(Montgomery, C.J., Dissenting). Rather, subrogation continues the existing debt. Compare Restatement § 62 cmt. c:

> The secondary obligor's right of subrogation is the right to enforce the obligee's claim against the principal obligor. Thus, the statute of limitations with respect to the secondary obligor's rights obtained through subrogation is the same as the statute of limitations with respect to those rights if enforced by the obligee.

Similarly, the right of subrogation does not create a new lien. 23 Williston § 61:52; Restatement § 28 cmt. a. Rather, subrogation continues the preexisting lien. 23 Williston § 61:54 ("[T]he sureties' right becomes an inchoate one as soon as they have entered into the relation of suretyship, and the equitable assignment of their principal's rights and remedies, when completed by their performance of the principal's obligation, relates back, as against each other and their principal, to that earlier time."); Restatement § 28 cmt. a.

At common law, courts apply a five part test to determine if a party has subrogation rights:

> (1) The codebtor must have made payment to protect his or her own interests;
> (2) the codebtor must have not been a volunteer;
> (3) the payment must satisfy a debt for which the codebtor was not primarily liable;
> (4) the entire debt must have been paid; and
> (5) subrogation must not cause injustice to the rights of others.

Page -79-

CCF, Inc. v. First Nat'l Bank & Trust Co. of Okmulgee (In re Slamans), 69 F.3d 468, 472 n.2 (10th Cir. 1995).

Bankruptcy law recognizes subrogation. Section 509 states, in full:

> Claims of codebtors.
> (a) Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.
> (b) Such entity is not subrogated to the rights of such creditor to the extent that--
> (1) a claim of such entity for reimbursement or contribution on account of such payment of such creditor's claim is--
>     (A) allowed under section 502 of this title;
>     (B) disallowed other than under section 502(e) of this title; or
>     (C) subordinated under section 510 of this title; or
> (2) as between the debtor and such entity, such entity received the consideration for the claim held by such creditor.
> (c) The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise.

The Tenth Circuit acknowledged a split in the courts over whether one must meet the requirements of common law subrogation in addition to those set forth in section 509. Slamans, 69 F.3d at 472 n.2. Indeed, this is an open question. See In re Fiesole Trading Corp., 315 B.R. 198, 203-

Case 04-17376-s11    Doc 194    Filed 03/08/05    Entered 03/08/05 16:11:00 Page 81 of 114

04 (Bankr. D. Mass. 2004) (Collecting cases and discussing the four approaches used by courts to integrate equitable subrogation with section 509); Celotex Corp. v. Allstate Ins. Co., (In re Celotex Corp.), 289 B.R. 460, 470-72 (Bankr. M.D. Fla. 2003)(same.)

One difference between the two types of subrogation is the requirement that the debt be paid in full. Many cases have noted that section 509 is available for partial payments. The language of 509(a) and (c) suggest this is the intent. Section 509(a) subrogates "to the extent of such payment." Section 509(c) defers payments to the subrogated party "until such creditor's claim is paid in full, either through payments under this title or otherwise." (Emphasis added.) Cornmesser v. Swope (In re Cornmesser's Inc.), 264 B.R. 159, 163 (Bankr. W.D. Pa. 2001). Furthermore, a creditor paid in full before the bankruptcy would no longer be a creditor of the debtor. Stephenson v. Salisbury (In re Corland Corp.), 967 F.2d 1069, 1078 (5th Cir. 1992); 4 Alan J. Resnick and Henry J. Sommer, Collier on Bankruptcy ¶509.02[3] at 509-5 (A codebtor that has paid in full before the bankruptcy has total subrogation and is the only creditor.)

Other cases hold that the debt must be paid in full.
See, e.g., In re Southwest Equip. Rental, Inc., 193 B.R. 276, 283 (E.D. Tenn. 1996).

The other difference between the two types of subrogation is the requirement under common law that subrogation not cause injustice to the rights of others. Slamans, 69 F.3d at 472 n.2 (fifth part of test). Section 509(a) automatically subrogates those that meet the requirements in this section, and equitable considerations are not part of this section. Rather, section 509(b) provides that an entity will not be subrogated to the extent that the claim is subordinated under section 510. See Cuda v. Nigro (In re Northview Motors, Inc.), 202 B.R. 389, 401 (Bankr. W.D. Pa. 1996)("[The] argument that the equities in this case do not favor subrogation by the Cudas shall be dealt with in the context of equitable subordination under § 510(c) rather than as an additional requirement under § 509(a)."). See also Fiesole Trading, 315 B.R. at 204 ("Because § 509 clearly delineates the requirements for an exceptions to subrogation, this Court will not superimpose state law doctrines to expand or contract the right to subrogation provided for under the Bankruptcy Code.")

Page -82-

In _Slamans_ the Court found that the party seeking subrogation did not qualify under section 509(a), and therefore specifically did not decide whether the lower courts must apply the five part equitable test "_in addition to_" the requirements of section 509. _Slamans_, 69 F.3d at 472 n.2. (Emphasis in original.)

Subrogation applies to satisfaction of debts prepetition as well as postpetition. _In re Bugos_, 760 F.2d 731, 734 n.4 (7th Cir. 1985). _See also_ _In re Corland Corp._, 967 F.2d at 1077-78 (emphasis in original):

> Stephenson paid the Bank directly only after Corland declared bankruptcy. ... We must consider the impact of subrogation. The Bank would have had a prepetition claim against the estate under the Corland Note. Stephenson, as guarantor, paid the Bank the amount owed and is now subrogated to the Bank's claim. Thus Stephenson is subrogated to the Bank's prepetition claim, and stands in the shoes of a prepetition creditor. _See_ _Matter of United Sciences of America, Inc._, 893 F.2d 720, 724 (5th Cir. 1990); _In re Flanagan Bros., Inc._, 47 B.R. 299, 303 (Bankr. D. N.J. 1985). Neither court below nor the Trustee has cited any authority for the proposition that postpetition payments on a guaranty are ineligible for setoff. Indeed, where, as here, a guarantor pays a debtor's creditor in full, § 509(a)'s right of subrogation has meaning _only_ if the payment is made postpetition; otherwise, there would be nothing to subrogate because a _pre_ petition payoff to the creditor would leave the creditor with no claim against the estate. _See_ 3 Collier ¶ 509.02 at 509-6-7. We are satisfied that Stephenson's claim against Corland "arose" prepetition for purposes of setoff under § 553.

Case 04-17376-s11    Doc 194    Filed 03/08/05    Entered 03/08/05 16:11:00 Page 84 of 114

and In re The Medicine Shoppe, 210 B.R. 310, 315 (Bankr. N.D. Ill. 1997).

2. **Recharacterization.**

> When a putative loan to a corporation is recharacterized, the courts effectively ignore the label attached to the transaction at issue and instead recognize its true substance. The funds advanced are no longer considered a loan which must be repaid in bankruptcy proceedings as corporate debt, but are instead treated as a capital contribution.

Sender v. The Bronze Group, Ltd. (In re Hedged-Investments Assoc., Inc.), 380 F.3d 1292, 1297 (10th Cir. 2004). "Recharacterization cases turn on whether a debt actually exists, not on whether the claim should be equitably subordinated." Id. (quoting Bayer Corp. v. Masco Tech, Inc. (In re AutoStyle Plastics, Inc.), 269 F.3d 726, 748-49 (6th Cir. 2001)). "The ultimate issue then is whether the transaction had the substance and character of an equity contribution or of a loan." Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.), 212 B.R. 898, 932 (Bankr. N.D. Ill. 1997), aff'd, 233 B.R. 409 (N.D. Ill. 1999), aff'd, 200 F.3d 1070 (7th Cir. 2000). Recharacterization effectively subordinates the entire claim to all creditors by reclassifying it as equity. Equitable subordination, as discussed below, is a remedial device based on equitable

principles that subordinates only to the extent necessary to offset the harm the other creditors suffered as a result of the inequitable conduct.

In <u>Sinclair v. Barr (In re Mid-Town Produce Terminal, Inc.)</u>, 599 F.2d 389, 390 (10th Cir. 1979) the Tenth Circuit addressed the equitable powers under the Bankruptcy laws to deny a dominant shareholder's security interest in company assets and subordinate a promissory note to the claims of that company's creditors. "In a case like this the usual procedure is to first determine whether the transaction was a contribution to capital rather than a loan." <u>Id.</u> at 393. The Tenth Circuit remanded the case for the bankruptcy court to analyze recharacterization as an issue separate from equitable subordination, and to consider three factors: (1) the initial operating capital, (2) the length of time the business was in operation at the time of the loan, and (3) whether the parties treated the transaction as a loan or as a capital investment. <u>Hedged-Investments</u>, 380 F.3d at 1298 (citing <u>Midtown</u>, 599 F.2d at 393). <u>Hedged-Investments</u> acknowledged that since <u>Mid-Town</u>, other circuits and tax cases have applied a multi-factor test, and then adopted it for use in the Tenth Circuit. <u>Id.</u> The factors now employed to distinguish true debt from camouflaged equity are:

Page -85-

> (1)  the names given to the certificates evidencing the
>       indebtedness;
> (2)  the presence or absence of a fixed maturity date;
> (3)  the source of payments;
> (4)  the right to enforce payment of principal and
>       interest;
> (5)  participation in management flowing as a result;
> (6)  the status of the contribution in relation to
>       regular corporate creditors;
> (7)  the intent of the parties;
> (8)  "thin" or adequate capitalization;
> (9)  identity of interest between the creditor and
>       stockholder;
> (10) source of interest payments;
> (11)     the ability of the corporation to obtain loans
>           from outside lending institutions;
> (12)     the extent to which the advance was used to
>           acquire capital assets;  and
> (13)     the failure of the debtor to repay on the due
>           date or to seek a postponement.
> Stinnett's Pontiac Serv., Inc. v. Comm'r of Internal
> Revenue, 730 F.2d 634, 638 (11th Cir. 1984).

Id.

Other cases have applied yet other factors, not included

on this list.  For example, in Central Cooperatives, Inc. v.

Irwin (In re Colonial Poultry Farms), 177 B.R. 291, 300

(Bankr. W.D. Mo. 1995) the Court also examined whether the

failure to treat the loan as capital caused the business'

ultimate financial failure. (Hereafter, "Causation").  And, in

In re Cold Harbor Assoc., L.P., 204 B.R. 904, 918-19 (Bankr.

E.D. Va. 1997), the Court looked to see if loans made to the

company were made in proportion to stock ownerships.

(Hereafter, "Proportionality"). In Official Committee of

Unsecured Creditors v. Credit Suisse First Boston (In re Exide

Technologies, Inc.), 299 B.R. 732, 741-42 (Bankr. D. Del. 2003) the Court considered whether the loan was secured. (Hereafter, "Collateral").

None of the factors is dispositive, and the significance of each varies with the circumstances. Hedged-Investments, 380 F.3d at 1298. These factors analyze whether the transaction reflects the characteristics of an arm's length negotiation. Matthew Nozemack, Note, Making Sense out of Bankruptcy Courts' Recharacterization of Claims: Why not use § 510(c) Equitable Subordination?, 56 Wash. & Lee L. Rev. 689, 708 (1999) ("Nozemack"). See also Kids Creek Partners, 212 B.R. at 931 (The criteria test whether the transaction bears the earmarks of an arm's-length commercial lending agreement.); Cold Harbor Assoc., 204 B.R. at 915 (The "primary factor" is whether the transactions bears the earmarks of an arm's length negotiation.)(citing Pepper v. Litton, 308 U.S. 295 (1939)); Colonial Poultry Farms, 177 B.R. at 299 (The criteria test an arm's-length bargain.)

The relevant time in a recharacterization analysis is the inception of the loan. Cold Harbor, 204 B.R. at 915; Colonial Poultry, 177 B.R. at 300; Nozemack, 56 Wash. & Lee L. Rev. at 710.

Page -87-

Too heavy an emphasis on the undercapitalization factor produces the "unhealthy deterrent effect" of discouraging legitimate loans to failing businesses by insiders; business owners should not fear that if their efforts fail the court would give disproportionate weight to the poor capital condition of the company. Hedged-Investments, 380 F.3d at 1298 n.1.; Nozemack, 56 Wash. & Lee L. Rev. at 715 (Often an insider is the only source of funds for a struggling company. If an insider creditor faces recharacterization even without inequitable conduct, it would be hesitant to loan money when the company needs it the most.) Accord Kids Creek Partners, 212 B.R. at 932 (Same, and suggesting that if the debtor's business is unique, unusual or based on a particular opportunity to obtain rights to develop a particular valuable property, those factors might justify small initial capital to develop and plan even if the business is undercapitalized for its ultimate needs.)

All of the cases found by the Court on the issue of recharacterization deal with direct loans to the business. See, e.g. Hedged-Investments, 380 F.3d at 1295 ("a loan advanced to [Debtor]"); Mid-Town, 599 F.2d at 391 ("The sum of $20,000 was advanced to Mid-Town."); Nozemack, 56 Wash. & Lee L. Rev. at 705-06 (Noting that recharacterization usually

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 89 of 114

arises in the context of "additional funds" loaned to a corporation after the initial capitalization.); cf. Uri v. Commissioner, 949 F.2d 371, 374 (10th Cir. 1991)(Taxpayers were not allowed to adjust basis in their stock of corporation for guarantees of bank loan to their "thinly capitalized" corporation.)  In this case, the UCC is attempting to recharacterize a guarantee of a bank debt.  The Court is not convinced this remedy is or should be available.  However, the Court will proceed as if this were possible.

3.  **Equitable subordination.**

Bankruptcy Code Section 510(c) states:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--
    (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
    (2) order that any lien securing such a subordinated claim be transferred to the estate.

Equitable subordination is an unusual remedy which should be applied only in limited circumstances.  Autostyle Plastics, Inc., 269 F.3d at 745 ("[W]e use great caution in applying the remedy..."); In re Mr. R's Prepared Foods, Inc., 251 B.R. 24, 28 (Bankr. D. Ct. 2000)(citing Fabricators, Inc. v. Technical

Page -89-

Fabricators, Inc. (In re Fabricators, Inc.), 926 F.2d 1458, 1464 (5th Cir. 1991)).

The leading case on equitable subordination is Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692 (5th Cir. 1977). That court stated the standard formulation of the common law of equitable subordination: (1) inequitable conduct, (2) injury to creditors or unfair advantage, and (3) consistency with the bankruptcy code. Id. at 699-700. Even upon a showing of all three factors, equitable subordination is not required, but merely permitted. Farr v. Phase-I Molecular Toxicology, Inc. (In re Phase-I Molecular Toxicology, Inc.), 287 B.R. 571, 579 (Bankr. D. N.M. 2002)(citing Autostyle Plastics, Inc., 269 F.3d at 744).

In Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.), 990 F.2d 551, 559 (10th Cir. 1993), the Tenth Circuit adopted the Mobile Steel standard and placed special emphasis on the inequitable conduct prong. Hedged-Investments confirms the continuing validity of that emphasis, "We adhere to the general rule, therefore, that equitable subordination is not justified absent a finding that the party sought to be subordinated engaged in inequitable conduct." Hedged-Investments, 380 F.3d at 1301.

A. **Inequitable Conduct.**

Page -90-

*Hedged-Investments* stated the test to be applied in determining "inequitable conduct":

> (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." <u>Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators)</u>, 926 F.2d 1458, 1467 (5th Cir. 1991) (interpreting the <u>Mobile Steel</u> standard and finding the claimant had committed fraud amounting to inequitable conduct by inducing other creditors to continue extending new credit to the troubled debtor company). <u>See also</u> <u>CTS Truss, Inc. v. FDIC (In re CTS Truss, Inc.)</u>, 868 F.2d 146, 148-49 (5th Cir. 1989) (formulating the categories as cases "in which a fiduciary of the debtor misuses his position to the disadvantage of other creditors; those in which a third party, in effect, controls the debtor to the disadvantage of others; and those in which a third-party defrauds other creditors").

<u>Id.</u>

The level of scrutiny by the Court for inequitable conduct varies depending on whether the party sought to be subordinated is an insider or not. <u>Castletons</u>, 990 F.2d at 599; <u>Hedged-Investments</u>, 380 F.3d at 1301. An insider is not automatically subordinated.

> We are unwilling to find a dominant shareholder may not loan money to a corporation in which he is the principal owner and himself become a secured creditor. To hold the debt may be subordinated on that basis alone would discourage owners from trying to salvage a business, and require all contributions to be made in the form of equity capital. We do not think that is desirable as social policy, nor required by the cases.

Mid-Town, 599 F.2d at 392.  See also Hedged-Investments, 380 F.3d at 1298 n. 1 (stating that a "main concern" in Mid-Town that excessive suspicion about loans made by owners and insiders of struggling businesses would discourage legitimate activities.); Mid-Town, 599 F.2d at 392 ("The modern cases generally hold that claims for loans by majority shareholders will not be subordinated to claims of other creditors absent inequitable conduct."  (citing cases and Colliers)).

If the claimant is an insider, the party seeking subordination need only show unfair conduct and a degree of culpability on the part of the insider.  Hedged-Investments, 380 F.3d at 1301.  If the claimant is not an insider or fiduciary, the party seeking subordination needs to demonstrate egregious conduct such as gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation.  Id. (citing Castletons, 990 F2d at 559).

B.  **Injury to creditors or unfair advantage.**

A party pursuing equitable subordination must also prove that the challenged creditor injured other creditors or obtained an unfair advantage.  Mobile Steel, 563 F.2d at 700 (Citing cases.); Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.), 622 F.2d 709, 720 (5th Cir. 1980); Phase-I Molecular Toxicology, Inc., 287 B.R. at 580;  Mr. R's Prepared

Page -92-

<u>Foods</u>, 251 B.R. at 29 (Noting that in the Second Circuit both advantage and injury must be shown to subordinate.  And, holding that, as a matter of law, a guarantor that pays a guarantee is subrogated to all rights and remedies of the original creditor so other creditors are not damaged by the subrogation.); <u>compare</u> <u>Carter-Waters Oklahoma, Inc. v. Bank One Trust Co., N.A. (In re Eufaula Indus. Auth.)</u>, 266 B.R. 483, 488 (10th Cir. BAP 2001)(Equitable subordination is a remedial doctrine that should be applied only to the extent necessary to offset the harm that creditors suffered as a result of the inequitable conduct.); <u>Mobile Steel</u>, 563 F.2d at 701 (Same.); <u>Castletons</u>, 990 F.2d at 560 (Lower court's finding that trustee failed to show unfair advantage or damage to other creditors was not clearly erroneous.)

C.      **<u>Consistency with the bankruptcy code.</u>**

Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. <u>Mobile Steel</u>, 563 F.2d at 700 (Citing cases.)

**<u>APPLICATION OF THE LAW TO THE FACTS IN THIS CASE</u>**

1.      **<u>Subrogation.</u>**

When Dirk DePree pledged his securities to the Bank he obtained suretyship status as a matter of law, with all the rights attendant to that status.  He could have waived rights

contractually at that time, and did waive one right, i.e., to subrogation in the event Escala became insolvent <u>and</u> Bank was undersecured. That contingency did not take place, so he has all rights as a surety including the right to be subrogated to the extent of his payment. This right is inchoate until Bank is paid in full.

In February, 2004 when Bank executed on the stock pledge, Dirk DePree was immediately entitled to exoneration. Escala's granting a second mortgage was a proper form of exoneration. This second mortgage was also proper under the indemnification agreement, which had been properly approved by the Members and Board. Execution of this second mortgage was probably unnecessary, because Dirk DePree would have been subrogated at the sale of the property under common law, and would have stepped into Bank's shoes to collect his indemnification. Alternatively, he could have asked the Bank to assign him their rights, contingent on full payment in the future.

The February, 2004 seizure by the Bank created no new debt by Escala. Similarly, no new lien arose as a result of the seizure. Both before and after the seizure Escala still owed the same amount. The Hotel was still encumbered for the full amount of the mortgage. As a matter of law, the seizure resulted in an equitable assignment, or an assignment by

operation of law, of that portion of Bank's debt that was paid
by Dirk DePree, to Dirk DePree as guarantor.  Also as a matter
of law, Dirk DePree became entitled to enforce his debt
against the collateral after Bank was paid in full.  No formal
documents were required.

Dirk DePree participated in Bank's foreclosure suit by
filing a cross-claim, and obtained a Judgment on the cross-
claim.  See Ex. 59, Foreclosure on Second Mortgage, Order.
Pursuant to the Judgment Dirk DePree is allowed to bid in the
amount of his Judgment or any portion thereof at the
foreclosure sale as the equivalent of cash, if and only if,
the bid includes payment of cash for the full amount owed by
Escala to Bank.  This satisfies the common law requirement
that the creditor be paid in full before the surety is
subrogated.  Although Dirk DePree pursued his legal remedies
under the Second Mortgage, the same result would be obtained
just through assertion of his subrogation rights.

Bank has not objected to Dirk DePree's claim.  In fact,
Bank acquiesced to his acquisition of a second mortgage.  Ex.
41.  And, Dirk DePree's second mortgage, behind Bank's, cannot
harm the Bank.  No one except Bank can complain about his
status.  Dirk DePree's assertion of a secured claim, behind
Bank, is not prejudicial to anyone.

Page  -95-

Dirk DePree satisfies the five part test to determine whether a person has common law subrogation rights. He paid Bank to protect his own interests. He was compelled to pay under his guarantee and was not a volunteer. Escala was primarily liable on the Bank's debt. Bank's debt will be paid in full by the time Dirk DePree's rights are asserted. And, subrogation will not injure the rights of others.[34]

Under Section 509(a), Dirk DePree secured a claim of the Bank against Escala, he paid that claim, and is subrogated to the extent of his payment. Bankruptcy subrogation applies to satisfaction of debts prepetition as well as postpetition. Under section 509(c) he is subordinated to the Bank's remaining claim "until" Bank's claim is paid in full. Pursuant to the foreclosure judgment, Bank must be paid in full before Dirk DePree can assert his rights.

**Conclusion**

---

[34] Escala purchased the Hotel and executed a mortgage for $3.5 million. That is all Escala will pay, $2.5 million to Bank and $1.0 million to Dirk DePree. At no time was the claim against the Hotel less than $3.5 million. Other creditors never had any right to the $1.0 million in contention here. Furthermore, no creditor was mislead into granting a junior mortgage on the assumption that the Bank debt was only $2.5 million. In contrast, Dirk DePree immediately recorded a second mortgage to give the world notice that the total encumbrance was the same. In fact, failing to recognize this mortgage would result in a windfall to other creditors of $1.0 million to which they were never entitled.

Page -96-

Either under the common law doctrine of subrogation or subrogation under the Bankruptcy Code, Dirk DePree has a valid, perfected, and foreclosed second lien on the Hotel property.

2. **Recharacterization.**

The Court reviews the evidence existing on or about the time of the challenged transaction, which is the spring of 2000 through August 1, 2000. Before addressing the Hedged-Investments factors, the Court generally observes that the transaction challenged is the guarantee of Bank's debt. Overall, this transaction appears to be an arms' length transaction. Nevertheless, the Court should examine the following factors:

(1) the names given to the certificates evidencing the indebtedness.

Normally this factor examines first, whether there are documents, and second, whether they were properly executed. See Exide Technologies, Inc., 299 B.R. at 740-41. In this case, there are properly executed notes and guarantees, and letter agreements that document the challenged transaction as a pledge securing Escala's note to the Bank. They meet all the proper formalities for a commercial loan. This indicates a true debt.

(2)  <u>the presence or absence of a fixed maturity date</u>.

The presence of a fixed maturity date and a definite obligation to repay indicate a debtor-creditor relationship.  <u>Stinnett's Pontiac Service, Inc.</u>, 730 F.2d at 638.

The guarantee agreement does not have a fixed maturity date.  The Court believes that most guarantees do not normally have a fixed maturity date.  The underlying loan does, however, have a fixed maturity date.  By implication, if Escala complied with the mortgage, the guarantee would expire by its own terms when the mortgage was paid.  Escala had a definite obligation to pay Bank, and a common law obligation to pay Dirk DePree if he paid the Bank on behalf of Escala.  This factor indicates a true debt.

(3)  <u>the source of payments</u>.

> The importance of the source of the payments,
> "is that if repayment is possible only out of
> corporate earnings, the transaction has the
> appearance of a contribution of equity capital,
> but if repayment is not dependent upon earnings,
> the transaction reflects a loan to the
> corporation." [<u>Estate of Mixon v. U.S., (In re</u>
> <u>Estate of Mixon[</u>)], 464 F.2d [394] at 405 [(5th
> Cir. 1972)].  <u>See also</u> Harlan v. United States,
> 409 F.2d 904, 909 (5th Cir. 1969).

<u>Stinnett's Pontiac Service, Inc.</u>, 730 F.2d at 638.

The underlying loan was to be paid from operations[35], infusions of money from the related entities and a refinance in 12 to 30 months.  See also Phase-I Molecular Toxicology, Inc., 287 B.R. at 577 (Payment of a bridge loan is not dependant solely on the future success of a debtor's business.)  The parties never contemplated having to make payments on the guarantee, because no one expected the securities to be levied on.  This indicates a true debt.

(4)  the right to enforce payment of principal and interest.

"If a fixed obligation to repay the advances exists, the transaction appears to be a loan."  Stinnett's Pontiac Service, Inc., 730 F.2d at 639 (citations omitted).

Bank had the right to enforce payment by Escala on the note, and had the right, upon breach, to realize on the guarantee.  After payment, Dirk DePree had a right to assert the Bank's rights against Escala.  This indicates a true debt.

(5)  participation in management flowing as a result.

---

[35] Tilden Drinkard testified that the pro formas showed the project would eventually pay debt from net operating income.

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 100 of 114

Increased participation in management as a result of advances indicates a capital contribution. <u>Stinnett's Pontiac Service, Inc.</u>, 730 F.2d at 639.

Before Dirk DePree agreed to guarantee Escala's loan, he had no connection with the entities. In the letter agreement regarding the pledge, it states "DePree agrees to provide advice and consultation to [Renaissance] from the effective date forward at no cost to the Company, and to serve on the Company's advisory board if such a board is assembled." After the loan closed, Dirk DePree had increasing responsibilities in Renaissance, which eventually owed Escala. This indicates a capital contribution.

(6) <u>the status of the contribution in relation to regular corporate creditors</u>.

This factor considers whether the loan was subordinated to general creditors, <u>Hedged-Investments</u>, 380 F.3d at 1299, or secured and unavailable to general creditors, <u>Cold Harbor</u>, 204 B.R. at 918. Subordination of the alleged debt implies a capital contribution. <u>Stinnett's Pontiac Service, Inc.</u>, 730 F.2d at 639. The guarantee in this case was not subordinated. In fact, it was secured as a matter of law by the assets secured to

Page -100-

the Bank under the doctrine of subrogation. The
pledged securities were unavailable to general
creditors. This indicates a true debt.

(7) the intent of the parties.

The Court finds the intent of the parties is
reflected in the documents. All parties intended that
Dirk DePree would guarantee Bank's debt for Escala. This
was confirmed by trial testimony. This indicates a true
debt.

(8) "thin" or adequate capitalization.

This is a borderline call. Escala was
undercapitalized. Dirk DePree had no involvement with
the establishment of Escala or in formulating its capital
structure. Weak capitalization alone is not
determinative. However, the Court has also found that
this was essentially a bridge loan to get the business up
and going, to do planning and development, with the
intent to refinance in 12 to 30 months. Pro formas
predicted eventual ability to pay expenses and debt.
Furthermore, it was clear to the Court that the parties,
at the time of the loan, expected the capitalization to
be sufficient for a while. If the purpose of this
exercise is to determine whether the parties were

Case 04-17376-s11    Doc 194    Filed 03/08/05    Entered 03/08/05 16:11:00 Page 102 of 114

intending a loan at the time, the Court finds that they were, and this factor would indicate a true debt.  If, however, the purpose is for the Court to determine whether the parties should have intended a loan based on the capitalization, this is a closer call and would indicate a capital contribution.  Upon reflection, however, the Court still thinks that overall, this factor indicates than it is a true debt.

(9)  identity of interest between the creditor and stockholder.

At the time of the guarantee discussions, Dirk DePree was not a stockholder or member of Escala.  In exchange for his guarantee he became a member of Renaissance, which eventually would own Escala.  On balance, this indicates a capital contribution.

(10)  source of interest payments.

At the time of the guarantee, no one expected that it would be realized on.  It was an unmatured obligation so no payments were due.  This factor would not be relevant.

Alternatively, if the guarantee were realized on, under a subrogation theory, Dirk DePree would eventually be entitled to the same funds that were already earmarked

for the Bank, which no one questions was a real debt.
Therefore, this would be a true debt.

(11)     the ability of the corporation to obtain loans
         from outside lending institutions.

At the time of the guarantee[36], Vincent Garcia was
shopping the market for a less expensive deal with other
potential guarantors, and apparently found none.  This
could indicate the parties intended a capital
contribution.  However, this factor tests whether other
commercial lenders would advance funds.  There is an
established market of commercial lenders.  Although it
appears likely that Escala was unable to obtain financing
for the Hotel elsewhere, that fact as such was not
established by the testimony or evidence at trial.
However, in this case, Escala was seeking a guarantor.
There is not a real market of potential guarantors.  The
Court does not put much weight on this factor in this
case.

(12)     the extent to which the advance was used to
         acquire capital assets.

_____

[36]In its post-trial brief, the UCC states that "Escala
could not obtain a loan when it came time to pay off the Bank
1st Loan."  While that may be true, it sheds no light on the
circumstances surrounding the initial guarantee in August,
2000, which is the relevant time period.

The guarantee helped Escala obtain the Hotel. However, the guarantee itself did not acquire the hotel. The guarantee guaranteed payments to Bank if, in the future, Escala defaulted on its interest and principal payments to Bank. When the guarantee was later exercised, it reduced the debt to Bank and did not buy any assets. This indicates it was a debt transaction.

(13)     the failure of the debtor to repay on the due date or to seek a postponement.

This part of the test clearly looks at behavior after the inception of the loan. This is useful information that can provide evidence of the parties intent at the earlier time. If there is no due date, or if there is no demand after the due date, this suggests that there was an intent that the loan would not be repaid. Stinnett's Pontiac Service, Inc., 730 F.2d at 640. In this case, Escala failed to pay Bank on the due date, but repeatedly sought and obtained extensions. This indicates a debt transaction. Furthermore, when Dirk DePree's pledge was exercised, he immediately took steps to obtain replacement security and later foreclosed on that, all of which indicates a true debt.

Causation.

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 105 of 114

In the case the Court cannot find that the business failed because this guarantee was not treated as a capital contribution.  Many events contributed to Escala's failure.  The events of September 11, 2001 and their tragic impact on the Hotel was one major factor.  Perhaps management was negligent in some respects.  Perhaps the Members became estranged to the point where they did not want to deal with each other or with Escala's or Renaissance's financial needs any longer.  The failure to refinance before the due date of Bank's loan was a major factor in the failure.  Probably the enterprise grew too fast.  The Court cannot find that the initial capitalization by itself caused the eventual failure, although it was a major factor.  This indicates a true debt.

Proportionality.

Loans and guarantees were not made proportionately by the equity owners.  In fact, Escala only had one owner at any given time; PI then Renaissance.  Dirk DePree was the only guarantor that secured his pledge.  At the relevant time he loaned no money directly to Escala.  Others loaned money directly to Escala but did not pledge securities or assets (other than insurance policies purchased by and

Case 04-17376-s11    Doc 194    Filed 03/08/05    Entered 03/08/05 16:11:00 Page 106 of 114

paid for by Escala).  The amounts guaranteed and loaned
appear to have no relationship to ownership in
Renaissance.  This indicates a true debt.

Collateral.

The guarantee was a secured claim against the Hotel
through subrogation.  This indicates a true debt.

**Conclusion**

Considering all of the above factors, the Court finds that
the guarantee transaction was more in the nature of an arm's
length commercial debt transaction than an equity contribution.

3.  **Equitable Subordination.**

The first task in this section is to determine whether
Dirk DePree was an insider.  "Insider" is defined by the
bankruptcy code, 11 U.S.C. § 101(31), as including, if the
debtor is a corporation, its directors, officers, persons in
control, relatives of directors, officers or persons in
control, affiliates and insiders of affiliates, and managing
agents.  Affiliates, 11 U.S.C. § 101(2), are entities that
directly or indirectly own 20% or more of a debtor.

The parties devoted substantial energies disputing whether
and when which entity controlled, owned, directed, managed, or
operated which other entities, and argued whether the governing
documents take priority over reality.  In the end, the Court

Case 04-17376-s11   Doc 194   Filed 03/08/05   Entered 03/08/05 16:11:00 Page 107 of
114

finds that Dirk DePree was an insider. The Founders started this venture, acquiring various properties, setting up LLCs, transferring assets and ownership interests, and repeatedly documenting their intents. Mark DePree, a Founder, was always in at least the position of a "person in control." Dirk DePree was his "relative" so was an insider[37]. By the end, Dirk DePree was at least a "person in control" of Renaissance, which was an affiliate of the Debtor, so he was an insider of an affiliate.

Under Hedged-Investments, the Court will determine if there was (1) inequitable conduct, (2) injury to creditors or unfair advantage, and (3) whether subordination would be consistent with the Bankruptcy Code, placing emphasis on the inequitable conduct inquiry.

A. **Inequitable conduct.**

Because Dirk DePree is an insider, the Court uses a heightened scrutiny for inequitable conduct. The UCC must present "material evidence of unfair conduct and demonstrate

---

[37]The Court will not address Dirk DePree's argument that he is not an insider because the legal documents must be given meaning and they show that PI had legal control over Escala at the time of the pledge. He argues that the intent of third parties to form an entity over which he might have control in the future is insufficient to overcome the writings. The Court concludes below that, even under the heightened standards for insiders, Dirk DePree should not be equitably subordinated.

some culpability on [Dirk DePree's] part." Hedged-Investments,
380 F.3d at 1302 (citations and internal punctuation omitted.)
The behavior proscribed is: (1) fraud, illegality, and breach
of fiduciary duties; (2) undercapitalization; or (3) claimant's
use of the debtor as a mere instrumentality or alter ego. Id.
Undercapitalization alone, however, is insufficient, unless
accompanied by the insider's exploitation of secret information
or misrepresentation of the Debtor's financial health. Id. at
1302-03.

There are no allegations of and no evidence of fraud,
illegality, or Dirk DePree's use of Escala as an
instrumentality or alter ego. Therefore, the UCC must
establish breach of fiduciary duties and/or culpable
undercapitalization[38]. The Court finds that the UCC has not
proven either by a preponderance of the evidence.

---

[38]At closing argument, the UCC's attorney conceded that
the UCC was not claiming fraud or illegal activities. Rather,
the UCC claimed that the Debtor was undercapitalized and that
the insiders "ran up the debt" and used their powers to secure
their positions inequitably. However, the only transaction
challenged in this proceeding is Dirk DePree's original
guarantee at the inception of Escala. And, his actions did
not cause this debt, he only guaranteed a debt properly
entered into by the Debtor. Furthermore, even if debts were
run up during the DePrees' tenure, there are no allegations or
proof that the debts were other than proper debts of the
Debtor.

"In order to plead a cause of action for breach of fiduciary duty, there must be shown the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach.  The absence of any one of these elements is fatal to the cause of action."  Pierce v. Lyman, 1 Cal.App.4th 1093, 1101, 3 Cal.Rptr.2d 236, 240 (Cal. Ct. App. 1991).  Accord Moody v. Stribling, 127 N.M. 630, 636 and 638, 985 P.2d 1210, 1216 and 1218 (Ct. App.), cert. denied, 127 N.M. 389, 981 P.2d 1207 (1999).

First, the Court finds no breaches of fiduciary duty to the Debtor.  While there were allegations that Dirk DePree acted outside of the authority of the Board of Renaissance and entered unauthorized contracts, all of those allegations dealt with transactions Dirk DePree allegedly entered for non-debtor entities.  And, those transactions were not put into evidence or quantified as to any damage that resulted.  There were no allegations, or evidence at trial, that Dirk DePree or the DePree Group usurped business opportunities for their own gain or competed with Renaissance or Escala.

The UCC presented a great volume of evidence about the DePree Group, and documented its increasing control over Renaissance over time.  The UCC suggests that the DePree Group gained this status through financial coercion, by making

Case 04-17376-s11    Doc 194    Filed 03/08/05    Entered 03/08/05 16:11:00 Page 110 of 114

unreasonable demands in exchange for the increasing amounts of money the group was loaning to keep Renaissance and the entities alive. The Court finds that intentionally gaining control over a business does not automatically demonstrate a breach of fiduciary duty to the creditors[39]. Even if this could be construed as a breach, the UCC has not proved any damages flowing from the change in control. And, lenders are usually free to impose whatever conditions (within the limits of the law) they choose when they are loaning money. See Hedged-Investments, 380 F.3d at 1303. There is no evidence that any loans were unlawful or overreaching.

The other possible claim for breach of fiduciary duty is Dirk DePree's guarantee of the Bank's loan in 2000. Nothing prevents an insider from loaning money to a company[40]. This is not a breach of duty or conduct that would warrant subordination. Phase-I Molecular Toxicology, Inc., 287 B.R. at 581 (Insider did not act inequitably by obtaining a security

---

[39] It may be actionable by other members or directors, however. See Walta v. Gallegos Law Firm, P.C., 131 N.M. 544, 552, 40 P.3d 449, 457 (Ct. App.), cert. denied, 131 N.M. 619, 41 P.3d 345 (2002) (Shareholder can bring individual claim against majority shareholder for "freeze out" if done in breach of a fiduciary duty owed the shareholder.)

[40] In fact, it is statutorily authorized. See § 53-19-16(C) NMSA 1978 (A member or manager may lend money to an LLC and shall have the same rights and obligations as if he were not a member or manager.)

interest in all of debtor's assets at a time when it knew that debtor was insolvent and could not obtain a loan from any other lender.)

Second, the Court can find no culpable undercapitalization. When Dirk DePree guaranteed the debt he did not advance money to the Debtor, and did not increase Debtor's debts. The Bank debt was properly documented, disclosed, and the mortgage filed of record. There is no evidence that Dirk DePree exploited secret information, or misrepresented Escala's financial health to anyone. To the contrary, the only evidence presented at trial was that internal financial statements were given to the Bank and several possible sources of refinancing, and they were not harmed.

B. **Injury to creditors or unfair advantage.**

The Court does not find any injury to creditors or unfair advantage to Dirk DePree. The only specific complaint raised by the UCC was that, if Dirk DePree had not obtained the Second Mortgage, there would have been $1.0 million for unsecured creditors. However, as discussed above, Dirk DePree had subrogation rights from the very beginning of his involvement with this project. The $1.0 million was never available to the unsecured creditors whether he obtained the second mortgage or

not.  No other damages to creditors were explained, documented, proved or quantified.

Dirk DePree has not obtained an unfair advantage.  As to his guarantee, he was compensated for a risk.  Because of that risk his assets were seized by the Bank, and he has lost the use of $1.0 million for several years.  This is not an advantage, or a disadvantage.  It was simply the result of his guarantee contract.  Other than the guarantee, all evidence shows that Dirk DePree was never compensated for his services, he never received any property or dividends from any entity, and that he personally loaned considerable amounts of money to the entities, including Debtor, for which he will never be repaid.

C.  **Whether subordination would be consistent with the Bankruptcy Code.**

Because the Court finds no inequitable conduct, and no damage to creditors or unfair advantage to Dirk DePree, the Court will not address whether subordination would be consistent with other provisions of the Bankruptcy Code.

**Conclusion**

Dirk DePree's second mortgage on the Hotel property should not be equitably subordinated.  The Court will enter an Order consistent with this Memorandum Opinion.

Case 04-17376-s11    Doc 194    Filed 03/08/05    Entered 03/08/05 16:11:00 Page 113 of 114

_[signature]_

Honorable James S. Starzynski
United States Bankruptcy Judge


I hereby certify that on March 8, 2005, a true and correct copy
of the foregoing was electronically transmitted, faxed,
delivered, or mailed to the listed counsel and/or parties.

George D Giddens, Jr
Attorney for Unsecured Creditors Committee
10400 Academy Rd NE Ste 350
Albuquerque, NM 87111-1229

William F Davis
Chair, Unsecured Creditors Committee
PO Box 6
Albuquerque, NM 87103-0006

R Thomas Dawe
Attorney for Dirk DePree
PO Box 1027
Albuquerque, NM 87103-1027

Robert H McKirgan
Attorney for Dirk DePree
40 N Central Ave Ste 1900
Phoenix, AZ 85004-4429

Paul M Fish
Attorney for Bank 1st
PO Box 2168
Albuquerque, NM 87103-2168

Robert H Jacobvitz
Attorney for Debtor in Possession
500 Marquette NW Ste 650
Albuquerque, NM 87102-5309

Alice Nystel Page
Office of the United States Trustee
PO Box 608
Albuquerque, NM 87103-0608

_James E. Burke_

Page -113-